[No. A125808. First Dist., Div. Five. Aug. 24, 2010.]

SCHRAM CONSTRUCTION, INC., Plaintiff and Appellant, v.
THE REGENTS OF UNIVERSITY OF CALIFORNIA et al., Defendants
and Respondents;
SOUTHLAND INDUSTRIES, Real Party in Interest and Respondent.

1042

1044

COUNSEL

Leonidou & Rosin, Janette G. Leonidou and A. Robert Rosin for Plaintiff and Appellant.

Charles F. Robinson, Stephen P. Morrell and David E. Bergquist for Defendant and Respondent The Regents of the University of California.

Allen Matkins Leck Gamble Mallory & Natsis, Raymond M. Buddie and Rick W. Grady for Defendant and Respondent DPR Construction, Inc.

Woodruff, Spradlin & Smart and M. Lois Bobak for Real Party in Interest and Respondent.

OPINION

JONES, P. J.—Respondent The Regents of the University of California (University) awarded a general contract to respondent DPR Construction, Inc. (DPR), for the design and construction of a medical center at the University of California, San Francisco's Mission Bay campus. On the University's behalf, DPR solicited bids for the mechanical, plumbing, and electrical (MEP) work on the project. Subcontractors were invited to bid on six individual packages (BP1–BP6) and three alternative combination packages (BP ALT-1, 2; BP ALT-3, 5; BP ALT-4, 5). After learning which subcontractors had bid on each package, DPR and the University decided to award a contract on combination package BP ALT-1, 2, instead of BP1 and BP2 individually. Real party in interest Southland Industries (Southland) was determined to be the lowest responsible bidder on BP ALT-1, 2. Appellant Schram Construction, Inc. (SCI), which had submitted bids on BP1 and BP2,

but not on BP ALT-1, 2, filed a petition for a writ of mandate challenging the award of the contract to Southland. The trial court denied SCI's petition. SCI appeals from the trial court's denial order, contending the University (1) violated Public Contract Code section 10506.7[1] by failing to award this contract to the "best value contractor"; and (2) failed to "adopt and publish procedures and required criteria that ensure that all selections are conducted in a fair and impartial manner," as required by section 10506.4, subdivision (c). We find no violation of section 10506.7, but reverse the order denying SCI's petition, as we conclude that the University's bid package selection procedure violated section 10506.4, subdivision (c). The matter is remanded to the trial court for issuance of a writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

DPR is the prime contractor on a University project for the design and possible construction of the UCSF (University of California, San Francisco) Medical Center at Mission Bay, which includes an energy center, an outpatient building, and a 289-bed hospital.

*The Initial Bidding*

In August 2008, DPR solicited bids for the MEP work on the project, which was to be awarded in two phases: (1) an immediate subcontract for design-assist preconstruction services, and (2) a subsequent change order for construction services, to be awarded if the University decided to proceed with actual construction. Subcontractors were invited to bid on six individual bid packages and one alternative combination package:

| | |
|---|---|
| BP1 | Energy Center: Heating, ventilation, air conditioning (HVAC) & plumbing |
| BP2 | Outpatient Building: HVAC & plumbing |
| BP3 | Hospital: Plumbing |
| BP4 | Hospital: HVAC/Dry |
| BP5 | Hospital: HVAC/Wet |
| BP ALT | An alternate combination of any or all of BP3, BP4, BP5 |
| BP6 | All Facilities: Electrical |

For each package, bidders were to submit prequalification materials, a best value questionnaire (BVQ), a lump-sum preconstruction bid that included labor rates, and an option percentage fee for future construction. The project was to be awarded based on the best value method of competitive bidding. According to a four-step selection process set out in the bid solicitation, DPR

---

[1] All statutory citations are to the Public Contract Code unless otherwise specified.

and the University would (1) prequalify bidders; (2) determine a total BVQ score for each prequalified subcontractor, based on its financial condition, relevant experience, demonstrated management competency, labor compliance, and safety record (§ 10506.5, subd. (g)); (3) conduct a blind bid opening; and (4) identify the best value bid (§ 10506.7, subd. (b)) by applying a formula to the lump-sum preconstruction bid, labor rates, and option percentage and dividing the result by the bidders' BVQ scores. The instructions to bidders provided: "[b]idders submitting bids will be announced and all cost or price information will be secured until the completion of the qualifications evaluation. . . . Final evaluation of the Best Value contractor shall be done in a manner that prevents cost or price information from being revealed to the committee evaluating the qualifications of the bidders prior to completion and announcement of that committee's decision."

SCI submitted bids for BP1 and BP3, but not BP2. Southland submitted bids for both BP1 and BP2, along with a letter offering the University a substantial discount if it was awarded both: "We feel there will be certain synergies and less staff required to perform the Phase One Pre-Construction work if we are awarded both BP1 and BP2 bid packages together. As such, we are pleased to offer a deduct of **$1,074,000** from our combined lump-sum BP1 and BP2 Pre-Construction lump-sum quotes."

Four days after the blind bid opening on October 16, 2008, DPR notified all bidders that "in the best interest of UCSF," it was rejecting all bids and conducting a rebid.

*The Rebid*

DPR requested resubmission of bids in accordance with amended instructions to bidders that invited bids on BP1 through BP6 from the initial bidding, as well as the following alternative combination packages:

| | |
|---|---|
| BP ALT-1, 2 | Energy Center/Outpatient Building: HVAC & plumbing |
| BP ALT-3, 5 | Hospital: Plumbing & HVAC wet |
| BP ALT-4, 5 | Hospital: HVAC wet and dry |

The amended instructions to bidders indicated that BP ALT-1, 2 had been "added as a new bid package alternate." The instructions provided: "Mechanical subcontractors can only bid on the bid package alternates if a stand alone bid package is submitted." Subcontractors were allowed to submit a rebid only on the bid packages for which they had submitted a BVQ in the initial bidding. SCI submitted a protest, contending this requirement

precluded it from bidding on BP ALT-1, 2 because it had not bid earlier on BP2 and that the rebid instructions favored subcontractors who had bid initially on both BP1 and BP2. SCI asked that DPR withdraw the new package or permit SCI to bid on BP2. SCI also asked DPR to "explain by example the method of selection of the successful bidders[, including] how the BVQ [score] is applied to single entity bids versus alternate bids. This needs to be clearly defined before the bid. For example how will you compare the combination of BP-3, BP-4 and BP-5 with BP Alt-3, 5 in conjunction with BP-4[?]"

DPR revised the instructions to bidders shortly thereafter to allow subcontractors who had bid initially on either BP1 or BP2 to submit a bid on the other package. The revised instructions to bidders gave subcontractors the option to submit additional BVQ information for BP ALT-1, 2 and advised them that if no new information was submitted, BVQ's for BP1 and BP2 would be reviewed and reevaluated for the combination package. SCI withdrew its protest the next day, noting that the revised instructions "took care of our concerns." DPR and the University never responded to SCI's request for an explanation of how the individual packages would be compared with the alternative combination packages.

The best value bid in the rebid was to be determined by a different formula than the one set out in the initial instructions to bidders. The formula for the rebid incorporated the same components, including the lump-sum preconstruction cost, labor rates, and option percentage, but in the rebid, the preconstruction cost, which had been weighted in the initial bidding by a multiplier of 10 "as it reflects a greater importance," was weighted by a multiplier of only three. The formula also factored in an add-alternate representing the monthly cost to the University if the preconstruction process extended beyond one year, weighting it by a multiplier of six. As in the initial bidding, the best value bid would be determined by dividing the result of the formula calculation by the bidder's BVQ score.

In the rebid, SCI submitted bids for BP1 and BP3, as well as a team bid for BP2, along with a letter "guarantee[ing] that if selected as the successful bidder . . . SCI can perform two (2) of the total bid packages bid."[2] SCI did not submit a bid for BP ALT-1, 2. Only two bids were submitted on this package, one from Southland and one from ACCO Engineered Systems

---

[2] DPR agreed to "accept an option where a single entity submits on multiple Bid Packages yet can only perform a lesser number of bid packages than submitted" if the bidder provided a statement guaranteeing the number of packages it could perform.

(ACCO). Southland and ACCO did not submit additional BVQ information specifically for BP ALT-1, 2, noting they were relying on their BVQ's for BP1 and BP2. The same four subcontractors submitted bids for BP1 and BP2, including Southland, ACCO, and SCI.

Less than a half-hour after SCI's president, Richard Schram (Schram), dropped off SCI's bid for BP2, he received a telephone message from DPR asking whether SCI had bid on BP ALT-1, 2. Schram told his secretary to inform DPR that SCI had not bid on this package. Later that day, DPR's regional manager for the Bay Area, George Pfeffer (Pfeffer), called Schram again, asking whether he intended to bid on BP ALT-1, 2. Schram said he did not.[3]

On November 12, 2008, the blind bid opening was conducted by two DPR employees and a University representative, Yvonne Kyrimis (Kyrimis). The sealed bids were commingled, and each was placed into an envelope marked with a letter. The bidders were assigned different letters for each bid package. Identifying each bidder by letter only, Kyrimis read off the bid figures to a DPR employee, who entered them into the computer. Kyrimis testified that she was the only person who saw the bid amounts associated with each bidder's name and that she did not reveal this information before the public bid opening.

Pfeffer and two University representatives, Lisa Henderson (Henderson) and Stuart Eckblad (Eckblad) (the Committee) then selected the bid packages that would be awarded. The Committee decided to award a contract on the alternative combination package, BP ALT-1, 2, instead of BP1 and BP2. At the time of their decision, Committee members knew the identities of the bidders on each package and had received a spreadsheet that showed the bid amounts but identified each bid only by letter.[4] The Committee did not know which bid each subcontractor had submitted. Pfeffer testified that "[the Committee] did not have the BVQ scores at that time" and did not know the "best point value." (See § 10506.7, subd. (b).)

On December 9, 2008, DPR announced only that four bid packages had been selected: (1) BP ALT-1, 2 (Energy Center/Outpatient Building); (2) BP3 (Hospital: Plumbing); (3) BP ALT 4, 5 (Hospital: HVAC wet and dry); and

---

[3] Pfeffer later testified that he called SCI for clarification because he noticed while reviewing the BVQ's that SCI's teammate on BP2 had indicated it was bidding on BP ALT-1, 2, but that SCI had not bid on this package. For a team bid to be deemed responsive, each member was required to submit bid materials.

[4] The BVQ's were evaluated by an architect, electrical and mechanical engineers, Pfeffer and another agent of DPR, and University representatives, including Henderson and Eckblad. The record is not clear when this evaluation took place.

(4) BP6 (Electrical). The lowest responsible bidders on these packages were not yet identified. DPR indicated that the identities, bids, and best value scores of the bidders would be announced December 11, 2008, and that the final bidding results would be posted the following day.

Later that day, Schram sent DPR an e-mail message, asking: "Is it your intent to open and report all BVQ scores for all bid packages?" and, specifically, whether BP1 and BP2 would be scored, combined, and compared with BP ALT-1, 2 "in order to determine the best value score and bidder." (Original underscoring.) The next day, SCI submitted a formal protest regarding the bidder selection process.

On December 11, 2008, DPR announced the bidders' identities, bids, and BVQ scores for the selected bid packages. The following day, the University computed the bids and posted the results. Southland was the lowest responsible bidder on BP ALT-1, 2, as its bid offered the lowest cost per quality point (best value ratio) for that package.

*SCI's Protest*

SCI maintained in its protest that "the bid documents [do not] allow for a unilateral pre-selection of bid packages" and that it easily could have submitted a combination bid for BP ALT-1, 2 "if the bid documents had documented that DPR could pre-select bid packages." SCI noted that "[s]ince all bids were to be considered under the Best Value Criteria, it was not necessary to submit a combination bid BP-ALT-1&2." SCI asked that its individual bids for BP1 and BP2 be combined and compared to the bids for BP ALT-1, 2. The University referred SCI's protest to Eckblad, who was director of the office of design and construction at UCSF Medical Center. Eckblad overruled the protest, noting that the bid instructions allowed DPR and the University to choose alternates in the University's best interest.

A week later, on December 19, 2008, SCI sent a written "protest/appeal" to the construction review board, which appointed a hearing officer to decide the matter. Schram, Pfeffer, and Kyrimis testified at the hearing on the protest. Pfeffer explained the decision to rebid the project, the selection process, and the reasons BP ALT-1, 2 was selected. He said there was a wide variance in the initial preconstruction bids, indicating bidders had different ideas about what was required. Pfeffer said he was aware of Southland's offer to discount the price on a combination BP1/BP2 package, but denied that this was the reason for the rebid. He said DPR and the University decided they needed to add new information to the bid instructions and "threw [the BP ALT-1, 2 package] in as an option since we were re-bidding anyway."

Pfeffer said DPR and the University knew before the bid documents were finalized and the project went out to bid that they wanted to retain the fewest number of subcontractors possible while maintaining a competitive environment. In his experience, the project would cost more overall if there were "several different entities of overhead in coordination." DPR and the University "structured the packages in sort of a fine line to get the proper amount of competition yet not have . . . many different plumbing contractors on site, many different mechanical or many different electrical subcontractors on site. We wanted to limit the number of people going through the design assist process and coordinating . . . ." Pfeffer said the Committee decided to select BP ALT-1, 2 in order to (1) avoid coordination issues between multiple subcontractors; and (2) maximize the level of competition on other bid packages since some bidders could not accept contracts on all the packages they bid. Pfeffer denied that he had steered work to any subcontractor in particular. He acknowledged that the Committee knew at the time of the bid package selection that Southland and ACCO were the only two bidders on BP ALT-1, 2 and that, if selected, this package would be awarded to one of the two. He said the Committee did not know which bid was Southland's. Pfeffer indicated that he had not tried to determine the identity of the bidders within each package, had not instructed anyone else to make this determination, and was not aware of anyone who had done so.

On January 23, 2009, the hearing officer denied SCI's protest, concluding the University was not required to select bid packages based on "best value," had reserved the option to select bid packages, and had disclosed this to prospective bidders. He found that the University had selected BP ALT-1, 2 before learning bidder identities and BVQ scores, did not know the identity of the low bidder when it selected this bid package, and therefore had applied a blind bidding process. He dismissed as "[m]ere speculation" SCI's contention that DPR and the University were able to determine the amount each bidder was bidding by comparing "BVQ's with the known bidders['] names and pre-qualification information." He concluded that the University would have compromised the blind bidding system if it had compared SCI's bids for BP1 and BP2 against the bids for BP ALT-1, 2. The hearing officer found no evidence of bias or favoritism in the bid package selection or low bidder determination, noting it was undisputed that the decision makers had found BP ALT-1, 2 in the University's best interest, that it was important to them to award the maximum work to one contractor to minimize overlap and conflicts in design development and construction, and that they had the discretion to do so. He found no evidence that Schram's mistaken belief it was not necessary to bid on BP ALT-1, 2 was caused by a communication from the University or the bidding documents.

*SCI's Petition for a Writ of Mandate*

SCI filed a petition for a writ of mandate (Code Civ. Proc., § 1085) compelling the University to award it a contract for the mechanical and plumbing work on the Energy Center and Outpatient Building and setting aside the contract with Southland. The trial court denied the petition, concluding SCI had not met its burden to show that the University had abused its discretion or acted contrary to law or that its findings were not supported by substantial evidence. SCI filed a timely notice of appeal from the order denying the petition.[5]

## DISCUSSION

SCI contends the trial court's decision should be reversed and the contract with Southland set aside because the University did not comply with the competitive bidding requirements governing the University's award of a public contract.[6]

I. *The Standard of Review*

On appeal from the denial of a writ of mandate challenging an award of a public contract, we perform the same function as the trial court and are not bound by its determinations. (*Coachella Valley Unified School Dist. v. State of California* (2009) 176 Cal.App.4th 93, 121 [98 Cal.Rptr.3d 9].) We review the public entity's decision for substantial evidence. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361 [87 Cal.Rptr.2d 654, 981 P.2d 499] (*Associated Builders*); *Ghilotti Construction Co. v. City of Richmond* (1996) 45 Cal.App.4th 897, 903 [53 Cal.Rptr.2d 389] (*Ghilotti*); *MCM Construction, Inc. v. City and County of San Francisco* (1998) 66 Cal.App.4th 359, 368 [78 Cal.Rptr.2d 44] (*MCM*).) Our review is limited to a determination of "whether the [public entity's] actions were arbitrary, capricious, entirely lacking in evidentiary support, or inconsistent with proper procedure." (*Ghilotti, supra,* 45 Cal.App.4th at p. 903; see *Associated Builders, supra,* 21 Cal.4th at p. 361 ["procedurally unfair"]; *Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294,

---

[5] SCI also appeals from a purported "Judgment," issued the same day, which is identical to the trial court's order denying the petition and does not order the entry of judgment. We deem the appeal to have been taken from the order denying the petition, which is appealable as a final judgment in a special proceeding. (*Haight v. City of San Diego* (1991) 228 Cal.App.3d 413, 416, fn. 3 [278 Cal.Rptr. 334]; *Dunn v. Municipal Court* (1963) 220 Cal.App.2d 858, 863, fn. 1 [34 Cal.Rptr. 251].)

[6] For purposes of our discussion, we treat the acts of DPR on the University's behalf as those of the University.

1303 [53 Cal.Rptr.2d 355] [" 'contrary to established public policy or unlawful or procedurally unfair' "].) In determining these issues, we defer to the University's factual findings when they are supported by substantial evidence. (See *MCM, supra,* 66 Cal.App.4th at p. 374.) To the extent our analysis requires us to decide questions of statutory interpretation or determine whether the University's actions violate applicable law, we exercise our independent judgment.[7] (*Valley Crest Landscape, Inc. v. City Council* (1996) 41 Cal.App.4th 1432, 1437 [49 Cal.Rptr.2d 184]; *Associated Builders, supra,* 21 Cal.4th at p. 361.)

"Because of the potential for abuse arising from deviations from strict adherence to [competitive bidding] standards . . . , the letting of public contracts universally receives close judicial scrutiny . . . ." (*Konica Business Machines U.S.A., Inc. v. Regents of University of California* (1988) 206 Cal.App.3d 449, 456 [253 Cal.Rptr. 591] (*Konica*).)

## II. *Did the University Violate Competitive Bidding Requirements?*

### A. *Controlling Legal Principles*

██ We begin our analysis with the statutory requirements that govern the University's award of a public contract. The University must award any contract for a "project" to the lowest responsible bidder or else reject all bids. (§§ 10501, 10506.4, subd. (b).)[8] Under a pilot program that took effect January 1, 2007, the University may identify the lowest responsible bidder "on the basis of the best value to the university" (best value method). (§ 10506.4, subds. (a), (c); see Stats. 2006, ch. 367, § 2, eff. Jan. 1, 2007, repealed Jan. 1, 2012.)[9] The best value method requires that the contract be

---

[7] SCI urges us not to afford any deference to the hearing officer's decision because he was appointed by the University and was not a neutral third party. SCI did not object on this ground at the protest hearing and asserted the alleged bias for the first time in its reply brief in the trial court. SCI therefore has waived its challenge to the independence of the hearing officer. (*Broden v. Marin Humane Society* (1999) 70 Cal.App.4th 1212, 1220 & fn. 7 [83 Cal.Rptr.2d 235].) In any event, in asserting these allegations of bias, SCI fails to recognize that the hearing officer issued what represents the final decision of the University, which we review on appeal.

[8] It is undisputed that the University's construction of the hospital in this case constitutes a project within the meaning of sections 10501 and 10506.4. (See § 10500 ["project" includes the construction of any University of California structure or building that will exceed $50,000 in cost].)

[9] Article 1.5 of the competitive bidding statutes applicable to the University of California "provides for a pilot program for the University of California when awarding construction contracts, applicable only to a single University of California campus located in the City and County of San Francisco." (§ 10506.4, subd. (a).)

awarded to the bidder offering the best combination of price and qualifications, based upon objective criteria. (§ 10506.4, subd. (c); see § 10506.5, subd. (g) ["qualifications" include financial condition, relevant experience, demonstrated management competency, labor compliance, and safety record].)

■ When the University relies on the best value method, as it did in this case, it must "adopt and publish procedures and required criteria that ensure that all selections are conducted in a fair and impartial manner." (§ 10506.4, subd. (c).) These procedures must comply with statutory provisions requiring:

—a bid solicitation that notifies prospective bidders of the "[c]riteria [the University] will consider in evaluating bids," the methodology it will use "in evaluating bids," and the relative importance of each of these criteria (§ 10506.6, subd. (c)(2)(A)–(C));

—the evaluation of bidder qualifications based solely on these criteria and the assignment of a qualifications score to each bid (§ 10506.7, subd. (a)); and

■ —identification of the bidder determined to be the best value to the University (best value contractor) by dividing each bidder's price by its qualifications score in order to determine the bid that provides "[t]he lowest resulting cost per quality point" (best value ratio) (§ 10506.7, subds. (a) & (b)). (§ 10506.4, subd. (c).) The selection procedure used by the University also must preclude the disclosure of cost or price information to the committee evaluating bidder qualifications before completion and announcement of its decision. (§§ 10506.6, subd. (d), 10506.4, subd. (c).) The procedure the University adopts in accordance with these provisions "shall be mandatory for [the University]." (§ 10506.4, subd. (c).)

■ SCI contends the University violated section 10506.4, subdivision (c) (1) by failing to award the contract for the mechanical and plumbing work on the Energy Center (BP1) and Outpatient Building (BP2) to the "best value contractor" (§ 10506.7, subd. (b)), and (2) by failing to adopt and publish procedures and required criteria that ensure its bid selections were fair and impartial (§ 10506.4, subd. (c)). In evaluating these contentions, we interpret and apply the competitive bidding statutes "from a practical rather than a hypothetical standpoint, with reference to the factual circumstances of the case." (*Ghilotti, supra*, 45 Cal.App.4th at p. 908; accord, *MCM, supra*, 66 Cal.App.4th at p. 370.) We consider them in light of the purpose for which they were enacted: " ' "[to] invit[e] competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best

work or supplies at the lowest price practicable . . . ." ' " (*Ghilotti, supra,* 45 Cal.App.4th at p. 909, quoting *Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 173 [36 Cal.Rptr.2d 521, 885 P.2d 934] (*Domar*); see *Konica, supra,* 206 Cal.App.3d at p. 456 ["to eliminate favoritism, fraud and corruption; avoid misuse of public funds; and stimulate advantageous market place competition"].) They " ' "should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest." ' " (*Ghilotti, supra,* 45 Cal.App.4th at p. 909, quoting *Domar, supra,* 9 Cal.4th at p. 173.) " ' "These provisions are strictly construed by the courts, and will not be extended beyond their reasonable purpose." ' " (*Ghilotti, supra,* 45 Cal.App.4th at p. 909, quoting *Domar, supra,* 9 Cal.4th at p. 173.)

### B. *Did the University Violate Section 10506.7, Subdivision (b)?*

SCI maintains that Southland was not the "best value contractor" (§ 10506.7, subd. (b)) for the mechanical and plumbing work on the Energy Center and Outpatient Building because SCI's bids and BVQ scores for BP1 and BP2, when considered together, offered the lowest cost per quality point for this scope of work.[10] We find no merit in this contention. Section 10506.7, subdivision (b) requires only that "[t]he award of the contract shall be made to the [best value contractor]." The University decided to award a contract on BP ALT-1, 2, and it is undisputed that Southland was the best value contractor for this package. Although the scope of work was the same for BP ALT-1, 2 and the combined individual packages (BP1 & BP2), the University's distinction between these packages was not arbitrary. Only BP ALT-1, 2 ensured that a single subcontractor would perform the mechanical and plumbing work on both the Energy Center and the Outpatient Building, as the University desired. Even if SCI prevailed on both BP1 and BP2 individually, the University could not have ascertained that both packages would be awarded to the same subcontractor without improperly identifying the bidders and the amounts of their bids. The University had discretion to set the project specifications, including the scope of work for each bid package. (See *Associated Builders, supra,* 21 Cal.4th at pp. 366, 374 [public agency is afforded considerable latitude in setting bid specifications, and these will be upheld if substantial evidence shows they are in furtherance of legitimate

---

[10] According to Schram's calculations, SCI scored $32,429 per BVQ point on BP1 (based on a BVQ score of 730) and $36,725 per BVQ point on BP2 (based on a team BVQ score of 792), for a total of $69,154 per quality point, less than Southland's best value ratio on BP ALT-1, 2 of $76,844 per quality point (based on a BVQ score of 985).

government interests].) SCI provides no authority that nullifies this policy decision based on its conclusion that a different packaging offered a better value.[11]

Having concluded that the University did not violate section 10506.7 in awarding a contract on BP ALT-1, 2 to Southland, we turn to SCI's remaining assertions of error.

### C. Did the University Violate Section 10506.4, Subdivision (c)?

SCI also contends the University failed to "adopt and publish procedures and required criteria that ensure that all selections are conducted in a fair and impartial manner." (§ 10506.4, subd. (c).) By its plain meaning, section 10506.4, subdivision (c) requires fairness in both the procedure for selecting the best value bid and the substantive basis for the bid selection. In addition, this provision requires the University to disclose to prospective bidders how the best value bid will be selected, including the bid selection procedure and the determinative factors in that decision. (*Ibid.*) SCI contends the University violated this provision by selecting the bid packages to be awarded (1) based on undisclosed criteria; and (2) in a manner that allowed it to predetermine the outcome of the bid selection. We agree.

### 1. Section 10506.4 Required Publication of the Bid Package Selection Criteria.

Section 10506.4, subdivision (c) provides for a fair and impartial bid selection by requiring the University to act in accordance with established procedures and criteria. The publication requirement serves this objective, not only by informing prospective bidders of how the bid selection will be made, but also by establishing a clear, public selection standard that prevents manipulation of the outcome and after-the-fact justifications. In this case, the University did not inform prospective bidders of the primary criterion on which it relied in selecting the bid package—the purported advantage of using fewer contractors to perform the MEP work—and it did not disclose the importance this factor would play in the bid package selection. The

---

[11] SCI has not shown its combined scores offered the best value to the University in any case. Schram based his calculations on SCI's BVQ scores for BP1 and BP2. Pfeffer testified that a bidder on BP1 and BP2 would not necessarily have the same BVQ score on BP ALT-1, 2 because the BVQ evaluation factored in the size of the project and the bidder's ability to handle a larger project. We note that although the BVQ scores of Southland and ACCO on BP1 and BP2 were the same for BP ALT-1, 2, the scores of the bidders on the other combination packages were different for the corresponding individual packages.

University also failed to provide any explanation of how the alternative and individual bid packages would be compared, even after SCI requested this information. The question before us is whether this information, which relates to the selection of bid packages, falls within the "procedures and required criteria" that must be published to prospective bidders under section 10506.4, subdivision (c). We conclude that it does.

On its face, the statute mandates publication of the procedures and criteria necessary to "ensure that all selections are conducted in a fair and impartial manner." (§ 10506.4, subd. (c).) It follows that information regarding the procedure and criteria for selecting bid packages (bid package selection information) must be disclosed to the extent the bid selection would otherwise be unfair or its integrity would be compromised by nondisclosure. We conclude publication of the bid package selection information was necessary to a fair and impartial bid selection in this case. First, the bid selection turned on a criterion that was not disclosed to bidders. The record demonstrates that the University's desire to award as much of the work as possible to a single subcontractor was a threshold criterion it applied in evaluating bids and that this factor was largely determinative of the best value bid. Although the concerns driving the selection of a specific bid package do not directly determine whether a particular bid will prevail, the University's desire for "less contractors . . . coordinating [with] each other" was the decisive factor in determining whether the bids on the individual packages would be considered at all. The failure to disclose this information "[left] bidders in the unfair position of having to guess what [would] satisfy the University's needs." (See *Konica, supra,* 206 Cal.App.3d at p. 457 [acceptance of a bid deviating from precise bid specifications].) Second, this information was material to the decision of prospective bidders contemplating a bid on BP ALT-1, 2. SCI knew it could be bound by its bids on both BP1 and BP2. But SCI did not bid on an alternative package with the same scope of work, claiming it believed it could be awarded BP1 and BP2, if its combined best value ratios on these packages were less than those on BP ALT-1, 2. Although the University did not prevent or discourage SCI from bidding on the alternative package, SCI lacked material information in deciding which packages to bid: the University's intent to award the work in the fewest packages possible. A contractor is placed at a competitive disadvantage, not only when undisclosed information undermines its ability to bid on a common basis, but also when the nondisclosure is material in deciding whether to submit a bid in the first instance. (See *MCM, supra,* 66 Cal.App.4th at p. 370 [noting that a bid's deviation from specifications " 'must be capable of facilitating corruption or extravagance, or likely to affect the amount of bids or the response of potential bidders' "].) Schram testified that SCI would

have bid on the alternative package if it had known how the University would evaluate the packages.[12] For the same reasons, the University's failure to disclose material information about the bid package selection procedure and criteria negatively impacted competition on BP ALT-1, 2. Indeed, SCI's scores on BP1 and BP2 suggest that the University's failure to disclose the procedures and criteria for selecting a bid package may have resulted in a higher cost to the public. (See *Domar, supra*, 9 Cal.4th at p. 177 ["[P]erhaps the most important goal of competitive bidding is to protect against 'insufficient competition to assure that the government gets the most work for the least money.' "].)

The University challenges this construction of section 10506.4, subdivision (c), contending for the first time at oral argument that the phrase "required criteria" refers exclusively to the factors considered in evaluating the qualifications of bidders. (See § 10506.5, subd. (g) [defining "qualifications"].) The University maintains, accordingly, that its intent to award the work to the fewest subcontractors possible, a decisive factor in the bid selection, was not one of the "criteria" required to be disclosed to bidders. Assuming the University has not waived this argument by failing to assert it in the trial court and in the briefing on appeal, we reject the University's interpretation of the statute on its merits. (See *Baugh v. Garl* (2006) 137 Cal.App.4th 737, 746 [40 Cal.Rptr.3d 539] ["Points not raised in the trial court may not be raised for the first time on appeal."]; *Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1336, fn. 2 [39 Cal.Rptr.3d 550] [waiver of right to raise issue that was not presented until oral argument on appeal].) Nothing in section 10506.4, subdivision (c) limits "required criteria" to the criteria to be used in evaluating bidder qualifications, and the statutory scheme supports a broader reading. First, section 10506.6, subdivision (c)(2)(A) requires the University to "identify[] and describ[e]" in its bid solicitation the "[c]riteria that [it] will consider in evaluating bids." The Legislature could have required identification and description of the "qualifications" to be considered in evaluating "bidders," as it did elsewhere in the statutory scheme, but it did not. (See § 10506.7, subd. (a) [requiring the University to "evaluate the qualifications of the bidders based solely upon the criteria set forth in the solicitation documents"]; *City of Port*

---

[12] At the hearing, Schram's attorney asked him: "Sitting here today[,] is there any doubt in your mind that had you known the way the University was going to evaluate the Combo Bid Package 1 and 2[,] that you would have submitted a bid for Combo Bid Package 1 and 2?" Schram answered: "Yes." Southland construes this testimony as an admission by Schram that he had doubts as to whether he would have bid on BP ALT-1, 2 if he had known how the University was going to evaluate the bid packages. We disagree. In context, Schram's response indicates that he would have bid on the combination package if this information had been disclosed.

*Hueneme v. City of Oxnard* (1959) 52 Cal.2d 385, 395 [341 P.2d 318], quoting *People v. Town of Corte Madera* (1950) 97 Cal.App.2d 726, 729 [218 P.2d 810] [" 'Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed.' "].) Moreover, in enacting section 10506.4, subdivision (c), the Legislature could have required the University, "[i]n order to implement this method of selection," to simply follow the procedures specified in the statutes and identify the statutory qualification criteria on which it intended to rely. Instead, the Legislature imposed a higher obligation: the adoption and publication of procedures and required criteria "that ensure that all selections are conducted in a fair and impartial manner." (§ 10506.4, subd. (c).)

The University also speculates that SCI decided not to bid on the alternative package because it preferred a contract on BP3 instead of BP2,[13] and having lost this gamble, may not now be relieved of its tactical mistake. Our holding turns, however, on the impact of the University's procedure on the public interest, not the loss to SCI. (*Ghilotti, supra,* 45 Cal.App.4th at pp. 908–909 [competitive bidding laws must be viewed in light of the public interest, rather than the private interest of a disappointed bidder].) Moreover, the information the University failed to disclose would have impacted the analysis of any reasonable subcontractor deciding whether to bid on BP ALT-1, 2. SCI was not provided the information necessary to accurately assess the risk that it would not be awarded either BP1 or BP2 and weigh this risk against its alleged preference for BP3.

2. *The Procedure Permitted the University to Influence the Bid Selection.*

The University's selection procedure also does not satisfy section 10506.4, subdivision (c) because it permitted the University to manipulate the bid selection in favor of or against particular bidders. As Pfeffer of DPR conceded, at the time the Committee selected BP ALT-1, 2, it knew the identity of the bidders on each package and specifically, that if selected, this package would be awarded to either Southland or ACCO. With this information, the Committee could purposefully exclude certain bidders and favor others by simply selecting a bid package. Indeed, in selecting the

---

[13] When a bidder prevailed on more packages than it had guaranteed to perform, the bid solicitation provided that the packages with the least number of bids would be awarded first and the packages with the most bids awarded last. In the event of a tie in the number of bids for a particular package, the packages would be awarded in the following order: BP3, BP5, BP4, BP1, BP2, BP6.

combination package, the Committee eliminated SCI without considering the best value ratios on the individual packages and effectively ensured that Southland or ACCO would be awarded the contract. While Southland and ACCO were two of four bidders on each of the individual packages (BP1, BP2), they were the only two bidders on BP ALT-1, 2. The Committee selecting the bid packages did not need to know bidder identities. The University contends that the bid instructions provide for the announcement of bidder identities on each package to ensure the timeliness of the bids and that this information is necessarily revealed in the prequalification process and BVQ evaluations. Even if these contentions are true, however, there is no requirement that the bid package be selected by the same decision makers that prequalified subcontractors or evaluated the BVQ's.

At the time of its decision, the Committee also had a spreadsheet setting out the figures making up each bid, including each bidder's hourly labor rates for various employees. SCI contends that this information enabled the Committee to determine specifically which bid was Southland's. Substantial evidence does not show the Committee knew what Southland's labor rates were. There is no evidence any Committee member knew which bidder submitted each bid in the initial bidding. Although the record demonstrates that each Committee member received a spreadsheet after the initial bidding that sets out each bidder's hourly rates, the bidders are identified only by letter. Nonetheless, selection of a bid package with knowledge of both the identities of bidders on that package and the bid figures creates at least the appearance of unfairness and a lack of impartiality, particularly since this was a rebid on the project. In any case, disclosure of price information to the Committee selecting the bid packages was not necessary. Pfeffer testified that the Committee selected BP ALT-1, 2 once it determined that it had two responsive bids on that package. Again, this determination could have been made by other agents of DPR and the University.

■ We recognize that the hearing officer found no evidence of favoritism or bias. But regardless of whether the University acted with an improper motive, in our view, the Committee's knowledge of bidder identities permitted the University to control the results by its selection of the bid packages to be awarded. In requiring the University to adopt procedures that "ensure" that the selection will be impartial, section 10506.4, subdivision (c) suggests it is not enough to simply refrain from favoritism; the University must put affirmative safeguards in place to prevent bias and other arbitrary factors from influencing the bid selection. We also conclude that the University's procedure here created an appearance of favoritism and undermined the integrity of the public bidding process, particularly since DPR had done a substantial amount of work with both Southland and ACCO in the previous five years.

### 3. *Was the Bid Package Selection a Permissible Use of "Alternates"?*

 The University contends the bid solicitation expressly allows it to select "alternates," including alternative bid packages, and establishes procedures for alternate selection that ensure a fair and impartial decision. This contention does not alter our conclusion. Section 8.3.2 of the instructions to bidders provides the University "the right to accept Alternates in any order or combination . . . ." as follows: "The opening of Bids and evaluation of Alternates will be conducted in accordance with a procedure that, at University's option, either (i) prescribes, prior to the time of Bid opening, the order in which Alternates will be selected or (ii) prevents, before the determination of the apparent low Bidder has been made, information that would identify any of the Bidders from being revealed to the representative of DPR selecting the Alternates to be used in determining the low Bidder. . . ." Assuming, without deciding, that BP ALT-1, 2 constitutes an "alternate" within the meaning of this provision and that these procedural options are sufficient to ensure a fair and impartial selection,[14] the University did not follow them in this case. The bid instructions did not set out any predetermined criteria for selecting the alternate bid packages, and, as discussed above, the Committee had within its knowledge "information that would identify . . . the [b]idders" at the time it selected the alternative bid package. (See *Pozar v. Department of Transportation* (1983) 145 Cal.App.3d 269, 272 [193 Cal.Rptr. 202] [a public agency must comply with the requirements in its bid solicitation concerning how bid amount is to be calculated].)

We have found no California decision that addresses alternative bid packages, and we are not aware of any law specifically precluding their use. The use of alternative bid packages is not necessarily at odds with competitive bidding law or its purposes, but we recognize that, like other alternative

---

[14] SCI contends BP ALT-1, 2 does not constitute an "alternate" within the meaning of section 8.3.2 of the instructions to bidders, as that term is commonly understood to refer to alternate bids within a package, on work to be added or deleted from the scope of a contract. (See 1 Acret et al., Cal. Construction Contracts, Defects, and Litigation (Cont.Ed.Bar 2008) Public Works Contracts: Disputes and Remedies, § 6.20, p. 481 ["An alternate is an alternative process, material, or design for accomplishing a portion of the work . . . ."]; *Atkinson v. State Dept. of Engineering* (1913) 165 Cal. 699, 703–704 [deductions from the total bid if work is omitted]; *Landsborough v. Kelly* (1934) 1 Cal.2d 739, 744–745 [37 P.2d 93] [alternate materials]; § 10126 ["alternates contemplating additions to, or deletions from, the base bid . . . ."].) SCI maintains further that any ambiguity in the bid instructions must be construed against the University. (See Civ. Code, § 1654 [contract construed against party causing the uncertainty]; *Weeshoff Constr. Co. v. Los Angeles County Flood Control Dist.* (1979) 88 Cal.App.3d 579, 587–588 [152 Cal.Rptr. 19] [written contract construed against the drafter].) No uncertainty or ambiguity existed here. The bid solicitation defines "Alternate" as "a University-proposed or DPR-proposed alternative, as described in the Bidding Documents" and refers to BP ALT-1, 2 as a "new bid package alternate." Schram referred to "single entity versus alternate bids" in his October 2008 e-mail protest. We note, however, that section 8.3.2's first procedural option applies only to alternate bids within a package.

bid procedures, it offers an easy means of circumventing these requirements and must be closely scrutinized. The California Legislature has determined in a similar context that the selective use of alternative bid procedures may violate public policy, specifically, the purposes of competitive bidding "[t]o eliminate favoritism, fraud, and corruption in the awarding of public contracts" and "[t]o provide all qualified bidders with a fair opportunity to enter the bidding process, thereby stimulating competition in a manner conducive to sound fiscal practices." (§ 100, subds. (d), (c); see Stats. 2000, ch. 292, § 1(b) ["[s]elective use of additive or deductive bid items to determine the lowest responsible bidder"].) To address this concern, the Legislature enacted provisions requiring certain state and local agencies using alternate bids to either specify in the bid solicitation how the lowest bidder will be selected, determine the lowest bidder without considering the alternates, or use a blind selection process. (See §§ 10126 [addressing "alternates contemplating additions to, or deletions from, the base bid"], 10780.5 [addressing "additive or deductive items"], 20103.8 [same].)[15] Significantly, we find similar measures absent here, namely, either predetermined, published criteria for the bid package selection or a selection process in which price information and bidder identities were not revealed to the Committee before the bid package selection—measures designed to preserve the integrity of the bid selection and assure that "any contract [is let] . . . to the lowest responsible bidder . . . ." (§ 10506.4, subd. (b).)

**▪** We conclude the contract with Southland must be set aside, as the University's violations of the competitive bidding statutes were not merely "technical or nonsubstantive."[16] (§ 10520; see *Ghilotti, supra,* 45 Cal.App.4th at p. 908 [setting aside a contract, not on minor technicalities, but when the deviation is capable of facilitating corruption or extravagance, or is likely to affect the amount of bids or the response of potential bidders]; see also *Konica, supra,* 206 Cal.App.3d at pp. 456–457 [contract set aside for failure to strictly comply with bidding requirements]; *Charles L. Harney, Inc. v. Durkee* (1951) 107 Cal.App.2d 570, 578 [237 P.2d 561] [statute requiring the letting of contracts by competitive bidding is mandatory, and a contract made without compliance is void and unenforceable as in excess of the agency's power].) They undermined the goal of "stimulating competition in a manner

---

[15] It is not clear whether SCI contends sections 10126, 10780.5 and 20103.8 impose obligations upon the University. We need not consider this question, in any case, as SCI conceded this point in the protest proceedings. We observe, however, that section 10780.5 applies specifically to California State University, section 20103.8 applies only to local agencies, and section 10126 does not apply in this case, as it addresses "additions to, or deletions from, the base bid . . . ."

[16] Neither Southland nor the University contends otherwise. Each confines its arguments to whether the violations occurred in the first instance.

conducive to sound fiscal practices" (§ 100, subd. (c)), and compromised the integrity of the selection process by failing to ensure procedural and substantive fairness.

### DISPOSITION[17]

The judgment is reversed. The matter is remanded to the trial court with directions to enter a new and different judgment granting the petition, issue a writ of mandate setting aside the subcontract between Southland and DPR, and conduct such further proceedings in this matter as it may deem advisable and within its jurisdiction, in a manner consistent with the views expressed in this opinion.[18] Costs are awarded to SCI.

Needham, J., and Bruiniers, J., concurred.

Petitions for a rehearing were denied September 22, 2010, and the opinion was modified to read as printed above. The petition of defendants and respondents for review by the Supreme Court was denied December 15, 2010, S187843.

---

[17] Following oral argument and submission of the cause for decision, the parties advised the court that they had reached a settlement, "conditioned upon (1) this court granting a stay of this matter; (2) the nonissuance of a decision on the appeal to allow the settlement to move forward; and (3) approval by the Regents [of the University] on September 15, 2010." Because this case presents issues of continuing public interest that are likely to recur, we decline to order a stay of this matter and, in our discretion, decide the appeal on the merits. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2009) § 6:125.1 (rev. # 1, 2009); *Cadence Design Systems, Inc. v. Avant! Corp.* (2002) 29 Cal.4th 215, 218, fn. 2 [127 Cal.Rptr.2d 169, 57 P.3d 647]; *Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 829, fn. 3 [50 Cal.Rptr.2d 101, 911 P.2d 1].)

[18] The court expresses no opinion as to what extent the University may be required to conduct a rebid for the mechanical and plumbing work on the Energy Center and Outpatient Building.