[No. D006857. Fourth Dist., Div. One. Nov. 23, 1988.]

KONICA BUSINESS MACHINES U.S.A., INC., Plaintiff and
Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents;
COPY-LINE CORPORATION, Real Party in Interest and
Respondent.

450

**COUNSEL**

Cutler & Cutler and Paul R. Salerno for Plaintiff and Appellant.

James E. Holst, Gary Morrison, Susan Amateau and David A. Dorinson for Defendants and Respondents.

Shenas, Shaw & Spievak, Peter Shenas and Douglas S. Waggaman for Real Party in Interest and Respondent.

**OPINION**

**WORK, J.**—After Konica Business Machines U.S.A., Inc. (Konica), unsuccessfully bid for a contract to provide copier services to the University of California (University), it sought a writ of mandate (Code Civ. Proc.,[1] § 1085) challenging the award of the contract to Copy-Line Corporation. Appealing from the denial of its petition, Konica contends (1) Copy-Line's bid did not comply with the requirements in the University's request for bids, and thus, the University should have either accepted Konica's conforming bid or rejected all bids and recommenced the bidding process; (2) alternatively, the request for bids was too ambiguous to result in fair competitive bidding; and (3) Copy-Line was given illegal preferential treatment over other bidders. We conclude Copy-Line's bid did not meet the specifications and gave it a prohibited competitive advantage, and the University's request for bids did not clearly notify bidders they could deviate from the specifications.

I

Konica had provided photocopy machines and service to the University for several years. When the University advertised a "Request for Quotation" (RFQ) for a new contract on a charge per copy basis, Konica

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

submitted a bid of 2.7 cents per copy for the first three years, and 1.6 cents per copy for the fourth and fifth years of the contract. Copy-Line, the successful bidder, submitted a bid of 1.5 cents per copy for the five-year period.

The University's RFQ specified the bid should include new or reconditioned copiers; all equipment bids must be at the same charge per copy regardless of model and features, and reconditioned equipment must carry new equipment warranty. Preceding a list of machine performance specifications was the following introductory paragraph: "Approximate volumes shown for each category are for the purpose of clarification of intent only. The University Copier Program will work with the vendor to establish machine features to respond to the local needs. It should be recognized that the machine accessories must be flexible to allow for specific requirements in some departments. In all cases, equipment offered with features additional to those required will be preferred if the cost per copy is equal."

Finally, following the list of performance specifications was a list of bid evaluation factors including (1) overall cost per copy, (2) compliance with machine performance specifications in RFQ, (3) plant visit to determine bidder's capability to provide maintenance and repair, (4) financial resources, (5) compatibility of equipment with University card control system and existing equipment, and (6) responses obtained from users list.

The RFQ requested categories of copiers (i.e., tabletop, small copiers, three types of intermediary copiers, and high volume copiers). Performance specifications for each category were listed.[2] Copy-Line's bid deviated from the specifications in the following instances.

Category 5 requested intermediary copiers, and included the following specifications: "Produce at least 40 copies per minute," and "Zoom

---

[2] To illustrate, a partial summary of the specifications is as follows. (1) *Tabletop* (under 2,500 copies/month): Produce at least 10 copies/minute; capable of copying onto both sides of paper manually. (2) *Small copiers* (2,500-5,000 copies/month): At least 15 copies/minute; zoom magnification and reduction; manual copying onto both sides of the paper. (3) *Intermediary copiers* (5,000-10,000 copies/month): At least 15 copies/minute; zoom magnification and reduction; manual copying onto both sides of paper; sorting capability; automatic document feeder. (4) *Intermediary copiers* (10,000-15,000 copies/month): At least 25 copies/minute; zoom magnification and reduction; capable of automatically copying onto both sides of paper; sorting capability; automatic document feeder; large capacity tray. (5) *Intermediary copiers* (15,000-30,000 copies/month): At least 40 copies/minute; zoom magnification and reduction; automatically copying onto both sides of paper; sorting capacity; automatic document feeder; large capacity tray. (6) *High volume copiers* (300,000-750,000 copies/month): At least 55 copies/minute; zoom magnification and reduction; automatically copying onto both sides of paper; sorting capability; automatic document feeder; large capacity tray.

magnification and reduction." For this category, Copy-Line bid two machines, (1) one which had the zoom magnification and reduction feature, but only made 35 copies per minute (Ricoh Model 5070), and (2) another which did not have the zoom magnification and reduction feature but which made 50 copies per minute (Ricoh Model 6085). Thus, neither machine fully met the bid specifications.

Category 6 requested high volume copiers, with the specifications stating, inter alia: "Produce at least 55 copies per minute"; "Zoom magnification and reduction"; and "Capable of AUTOMATICALLY copying onto both sides of paper." Copy-Line bid a machine which had enlargement and reduction features, but did not have the zoom feature; made only 50 copies per minute; and semi-automatically, rather than fully automatically, copied on both sides of the paper (Ricoh Model 6085). Regarding the semi-automatic feature, after the first side of the paper was copied, the operator had to turn the original document over to copy the second side of the paper, but did not need to manually reinsert the copy into the machine.[3]

In contrast, Konica's bid met, or surpassed, all the performance specifications listed in the RFQ.

## II

█ The test on appeal from a writ of mandate action under section 1085, is whether there is substantial evidence to support the agency's findings, and it is appellant's burden to show there is no substantial evidence. (*Taylor Bus Service, Inc.* v. *San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1340-1341 [241 Cal.Rptr. 379].) Under Public Contract Code section 10507, the University must award contracts for goods, materials, and services requiring an annual expenditure of $50,000 "to the lowest

---

[3] In addition to the deviations in categories 5 and 6 described *infra,* Konica asserted a deviation in category 2, claiming Copy-Line's models did not have the required zoom magnification feature. To the contrary, Copy-Line bid three machines in category 2, one of which did have the zoom feature (Ricoh Model 4085). Konica does not pursue this point in its reply brief. We do note the declaration of the University's buyer indicates Copy-Line substantially conformed with the specifications in category 2, perhaps referring to the two other machines bid in that category without the zoom feature. Resolving all inferences in favor of the judgment, we assume the bid in category 2 did not deviate from the specifications.

Konica also asserted in its opening brief the machines bid by Copy-Line in categories 4 and 5 also only had semi-automatic duplexing. Konica had only clearly made this objection in the court below regarding category 6, and the record does not indicate whether the model bid in categories 4 and 5 (Ricoh Model 5070) had only semi-automatic duplexing. In any event, our analysis as to compliance with the RFQ is the same regardless of whether Copy-Line bid a machine with only the semi-automatic duplexing feature in categories 4 and 5 as well as 6.

responsible bidder *meeting specifications,* or else reject all bids." (Italics added.)

■ The issue here is whether there is substantial evidence to support a finding that Copy-Line's bid met the specifications within the meaning of Public Contract Code section 10507. ■ An opinion by the Attorney General summarizes relevant principles: "A basic rule of competitive bidding is that bids must conform to specifications, and that if a bid does not so conform, it may not be accepted. [Citations.] However, it is further well established that a bid which substantially conforms to a call for bids may, though it is not strictly responsive, be accepted *if the variance cannot have affected the amount of the bid or given a bidder an advantage or benefit not allowed other bidders* or, in other words, if the variance is inconsequential. [Citations.] [¶]. . . 'It is inconceivable that inconsequential departures will not appear. . . . But if the unit in toto, proposed to be erected, generally conforms to the city's needs and will substantially perform the service which the city requires, non-conformity between plan and bid does not exist.'" (47 Ops.Cal.Atty.Gen. 129, 130-131 (1966), quoting *Dougherty* v. *Folk* (1941) 46 N.E.2d 307, 311, italics added.)

■ *Dougherty* v. *Folk, supra,* 46 N.E.2d 307 does not address the issue of whether the public entity's acceptance of a deviating bid unfairly disadvantaged an unsuccessful bidder whose bid conformed to the advertised specifications. *Dougherty* only holds the public entity has the power to accept a bid which substantially conforms to the advertised requirements. There was no evidence that any strictly conforming bid was rejected. This also is the limited factual scenario addressed by the Attorney General's opinion which quotes from *Dougherty*.

A deviating bid might be acceptable as substantially complying with the University's RFQ had no bids met the advertised requirements. This was not the situation here, and there is no hint in the RFQ that "substantial" compliance would be the standard when reviewing bids, some which meet the specifications fully and some which do not.

But, more significantly, the Attorney General concludes a deviation is substantial unless it is so inconsequential that it *could not affect the amount of the bid.* We presume Copy-Line equipment will substantially perform the service actually required by the University even though it does not meet the performance and production specified in every category. We then limit our analysis to whether the deviations gave Copy-Line an unfair competitive advantage by allowing it to make a lower bid than it would have been able to make without the deviations. (See *L. Pucillo & Sons* v. *Mayor and*

*Council, etc.* (1977) 375 A.2d 602, 605-606 [factors to determine whether deviation is minor irregularity or substantial departure include whether deviation could be vehicle for favoritism, affect amount of bid, influence potential bidders to refrain from bidding, or affect ability to make bid comparisons]; *Harry Pepper & Assoc.* v. *City of Cape Coral* (Fla.Dist.Ct.App. 1977) 352 So.2d 1190, 1193.)

Konica argues the equipment requirements listed in the University's RFQ in categories 5 and 6 involved the highest volume of copies, and thus, were the most important in determining the price to bid per copy. Based on Konica's figures, the price of one machine bid in category 5 was $7,625 (Ricoh Model 5070—zoom capability but only 35 copies/minute), and the price of the other machine bid in category 5 as well as in category 6, was $11,525 (Ricoh Model 6085—50 copies/minute but no zoom capability); whereas the price of the machine which should have been bid in categories 5 and 6 to meet the express bid requirements was $14,075 (Ricoh Model 7060—zoom capability and 62 copies/minute).

The record does not indicate the formula used by Copy-Line to determine price per copy. An examination of Copy-Line's bid reveals that (as required by the RFQ) it set the price per copy at 1.5 cents for all the models, even though the models covered a wide price range; i.e., approximately $1,700, $2,100, $3,300, $3,500, $4,100, $4,700, $5,100, $5,700, $7,100, $8,200, $10,500, and $14,200. Nevertheless, logically the price per copy bid by Copy-Line must increase if Copy-Line were to factor in its bid the more expensive copiers required to meet its advertised specifications. Although this record is inadequate to state with mathematical precision the price advantage generated by Copy-Line's providing the less expensive, less capable machines, any deviation provides a competitive advantage not available to a bidder who strictly held to the University's advertised specifications.[4]

Neither Copy-Line nor the University directly dispute the fact that strict adherence to the specifications in categories 5 and 6 would have resulted in an increased bid. Their sole claims are that the Copy-Line equipment is acceptable to the University in spite of its lack of capacity and specialized features, and that Konica has not shown it would have made a lower bid if it had deviated from the specifications. Regardless of what Konica might

---

[4]Based on Copy-Line's figures, the cost of the models bid by Copy-Line in categories 5 and 6 is:
(5) Models 5070 and 6085. (Highest cost Model 6085) $10,583 x 49 copiers = $518,567.
(6) Model 6085. Cost $10,583 x 6 copiers = $63,498.
Assuming Copy-Line had bid the strictly conforming Model 7060 which it priced at $14,254 instead of Model 6085 priced at $10,583, the price of the copiers bid in categories 5 and 6 would have been $3,671 higher, which for 55 copiers would total $201,905.

have bid had it also deviated, the record is clear that Copy-Line, by deviating from the specifications, obtained a competitive advantage by not meeting the minimum capabilities specified.

Further, as we explain, we conclude the RFQ can only be interpreted as setting minimum performance specifications for the copier, with which bidders were required to strictly comply. ■ The request for public bids "must be sufficiently detailed, definite and precise so as to provide a basis for full and fair competitive bidding upon a common standard and must be free of any restrictions tending to stifle competition. [Citations]" (*Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 821 [25 Cal.Rptr. 798].)

In *Baldwin-Lima-Hamilton Corp.* v. *Superior Court, supra,* 208 Cal.App.2d at pages 807-808, 817-818, the specification required the materials be manufactured in the United States, and the contract was nevertheless awarded to a bidder who included parts manufactured outside the United States. The court held a writ of mandate prohibiting the award of the contract could be granted on the basis that the request for bids was not sufficiently definite to provide for fair competitive bidding. That is, subsequent to issuing the request for bids, it was determined that the "place of manufacture" provision was unenforceable since it was in conflict with certain federal treaties, but the bidders could not be reasonably expected to have knowledge of the treaties to infer that despite the clear language of the provision they could submit acceptable bids including foreign materials. The court noted it was reasonable to assume the language of the bid would deter persons from submitting bids covering foreign goods, thus reducing the number of bidders and defeating the objectives of competitive bidding. (*Id.* at pp. 821-823.)

■ The purpose of requiring governmental entities to open the contracts process to public bidding is to eliminate favoritism, fraud and corruption; avoid misuse of public funds; and stimulate advantageous market place competition. (See legis. intent declared in Pub. Contract Code, § 10300; *Miller* v. *McKinnon* (1942) 20 Cal.2d 83, 88 [124 P.2d 34, 140 A.L.R. 570]; *Terminal Const. Corp.* v. *Atlantic Cty. Sewer Auth.* (1975) 341 A.2d 327, 330.) Because of the potential for abuse arising from deviations from strict adherence to standards which promote these public benefits, the letting of public contracts universally receives close judicial scrutiny and contracts awarded without strict compliance with bidding requirements will be set aside. This preventative approach is applied even where it is certain there was in fact no corruption or adverse effect upon the bidding process, and the deviations would save the entity money. (*Ibid.*; *L. Pucillo & Sons* v.

*Mayor and Council, etc., supra,* 375 A.2d at p. 605; *Harry Pepper & Assoc.* v. *City of Cape Coral, supra,* 352 So.2d at pp. 1192-1193.) The importance of maintaining integrity in government and the ease with which policy goals underlying the requirement for open competitive bidding may be surreptitiously undercut, mandate strict compliance with bidding requirements. (*Gil-Bern Construction Corp.* v. *City of Brockton* (1968) 233 N.E.2d 197, 199.)

 Here, the RFQ does not suggest the bidder need only "substantially" comply with the specifications. To permit the University to allow deviations from precise specifications in its public call for bids leaves bidders in the unfair position of having to guess what will satisfy the University's needs.

The University argues that Konica should have been alerted that it retained the option to award its contract to a bidder whose machines could not perform to the advertised specifications. Following several pages of specific, detailed production and equipment performance requirements (i.e. "produce *at least* 55 copies per minute," italics added), the RFQ listed general "bid evaluation factors." These included overall cost per copy, equipment performance compliance with specifications, financial resources of supplier, and other items not relevant to our inquiry. Based on these general bid evaluation factors, it is University's position that any responsible bidder should have realized that its bid meeting *all* specifications was subject to being rejected in favor of one which was priced on equipment which did not meet the express machine performance standards so strongly emphasized in its *"Machine Performance Specifications"* section.

We do not believe the University's construction of its stated bid evaluation factors is logical, however, and we are certain it does not clearly provide potential bidders with notice that a fully complying bid may be rejected in favor of one which is not. Public Contract Code section 10507 requires compliance with "specifications." The RFQ listed performance requirements in a section entitled "specifications." Bidders were entitled to expect bids which did not meet these specifications would be rejected in favor of those which did or the contract would be rebid.

In summary, we conclude the contract must be set aside since the deviations from the specifications gave Copy-Line a competitive advantage; and the RFQ did not clearly notify bidders they could bid on machines not meeting the listed specifications.

## III

Copy-Line forcibly argues that it will be economically devastated should this contract be voided because it has incurred substantial expense in purchasing the copiers which it has provided to the University. Even though the copiers will be returned, Copy-Line argues it is not at all clear it can recoup its investment and it may also incur storage expenses. These concerns are only potential at the moment because it is uncertain what specifications will be designated in the new RFQ and who will be the successful bidder. ■ Further, although failure to publicly bid contracts when required by statute renders them void so that the public entity may not reimburse a contracting party for service or materials the agency has been provided (see *Miller* v. *McKinnon, supra,* 20 Cal.2d at pp. 89-92), here the bidding process did take place. We express no view as to the reimbursement rights of Copy-Line should it not obtain the contract on rebid. We are satisfied, however, there is no legal impediment to requiring Copy-Line to service the University's needs on a per diem basis at the present contract rate until the new contract is bid, and requiring the University to pay on that basis. (See *L. Pucillo & Sons* v. *Mayor and Council, etc., supra,* 375 A.2d at pp. 602, 607.)

The judgment is reversed. The superior court is directed to issue a writ mandating the University to publish a new RFQ and call for rebids within 30 days of our remittitur. Pending acceptance of the successful rebid, Copy-Line shall continue to provide services conforming to the terms of the now vacated contract and the University shall compensate Copy-Line on a per diem basis for services received.

Kremer, P. J., and Benke, J., concurred.