Filed 11/19/21  MedImpact Healthcare Systems v. Cal. Dept. of Health Care Services CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MEDIMPACT HEALTHCARE SYSTEMS, INC., <br><br> Petitioner and Appellant, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES, <br><br> Defendant and Respondent; <br><br> MAGELLAN MEDICAID ADMINISTRATION, INC., <br><br> Real Party in Interest and Respondent. | D078287 <br><br><br> (Super. Ct. No. 37-2020-00007154-CU-WM-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed.

McDermott Will & Emery, Douglas H. Carsten; Wilson Sonsini Goodrich & Rosati and Joshua Mack for Petitioner and Appellant.

Rob Bonta, Attorney General, Cheryl. L. Feiner, Assistant Attorney General, Richard T. Waldow, Gregory D. Brown, and Julie T. Trinh, Deputy Attorneys General for Defendant and Respondent.

Greenberg Traurig, Jeremy A. Meier, Kurt A. Kappes, and Samuel S. Hyde for Real Party in Interest and Respondent.

## INTRODUCTION

By executive order, Governor Newsom directed the Department of Health Care Services (DHCS or the Department) to transition all Medi-Cal pharmacy benefits and services from managed care to a fee-for-service system. As a result, DHCS solicited bids to award a multi-million dollar public contract—the Medi-Cal Rx contract—to a qualified company to service the takeover, operation, and eventual turnover of the administration of the Medi-Cal pharmacy fee-for-service system. The Department issued a Request for Proposal (RFP) and, after a multiple stage evaluation process, it awarded the Medi-Cal Rx contract to Magellan Medicaid Administration, Inc. (Magellan), who received the highest total score of the five proposals submitted.

Appellant MedImpact Healthcare Systems, Inc. (MedImpact), one of the unsuccessful bidders, petitioned for writ of mandamus in the superior court to vacate the award of the contract to Magellan. The trial court denied the petition, finding the Department's decision was not arbitrary, capricious or entirely lacking in evidentiary support. On appeal, MedImpact asserts the court applied an overly deferential standard of review and should have directed the Department to vacate the award of the contract to Magellan, for two reasons: 1) DHCS deviated from the requirements of the RFP and violated the governing statutes by failing to award MedImpact certain preference points; and 2) DHCS scored the narrative responses in an arbitrary and capricious manner. On our de novo review, we conclude MedImpact's assertions lack merit and affirm the judgment.

2

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The RFP Process*

Over 13 million Californians were enrolled in Medi-Cal in 2019. Approximately 10 million of these individuals received benefits through managed care plans. On January 7, 2019, Governor Newsom issued Executive Order N-01-19 directing the Department to transition all Medi-Cal pharmacy benefits and services from managed care plans to a fee-for-service system, with the goal of improving and standardizing access to prescription drugs.

In response to the Governor's executive order, the Department issued an RFP to solicit bids to award the Medi-Cal Rx contract to a qualified company for the "takeover, operation and eventual turnover of the administration" of the Medi-Cal pharmacy services from managed care to a fee-for-service system. The term of the contract was expected to be four years and 11 months with five optional, one-year contract extension periods, and was anticipated to be effective on November 18, 2019 and continue through June 30, 2024.

The RFP was issued subject to Public Contract Code[1] section 10344, which governs the evaluation of proposals and the award of a public contract by state agencies, including the Department.[2] Section 10344, subdivision (a), requires that an RFP include "a clear, precise description of the work to be

---

[1] All further undesignated statutory references are to the Public Contract Code, unless otherwise indicated.

[2] Section 10344 is part of Article 4 of the Public Contract Code, which governs all contracts "entered into by any state agency for services to be rendered to the state." (§§ 10335, 10344.)

3

performed or services to be provided, a description of the format that proposals shall follow and the elements they shall contain, the standards the agency will use in evaluating proposals[.]"  Of importance here, the statute gives the state agency two options of evaluating proposals and awarding a public contract:  1) a process by which bids are sealed and awarded to the "lowest responsible bidder meeting the standards" (§ 10344, subd. (b)); and 2) a process by which the agency gives "substantial weight . . . to the contract price proposed by the bidder," but uses an evaluation scoring method and awards the contract "to the bidder whose proposal is given the highest score by the evaluation committee" (§ 10344, subd. (c)).

Here, the Department issued the RFP using the second process set forth in section 10344, subdivision (c).  The RFP stated that bidders would be scored on their responses to a "[n]arrative [p]roposal," which addresses how the bidder will meet the RFP's technical requirements, and a "[c]ost [p]roposal," which sets forth the bidder's proposed costs to meet the RFP's technical requirements.  The RFP contained detailed instructions for the completion of both parts and stated the contract would be awarded to "the most responsive and responsible firm earning the highest score."

The RFP explained that a "multiple stage evaluation process" with four different committees would be used to review and score submitted proposals. The narrative proposals would be scored by Department staff working in the pharmacy benefits division and other areas of the Medi-Cal program, with oversight from contract services managers and executive management officials, based on a scoring rubric from 0 (Inadequate) to 4 (Excellent or Outstanding).  The evaluators could consider a number of issues, "including *but not limited to*" the depth of answers, any weaknesses or deficiencies, a demonstrated understanding of the Department's needs, an illustrated

4

capability to meet all of the requirements, the advancement of the Department's goals and objections, and the capacity of the bidder to exceed regular needs through enhanced features or innovative business solutions. (Italics added.)

The RFP provided a chart setting out the maximum scores and weights for each "Narrative Proposal Rating Category" and indicated the maximum narrative proposal score available was 721.2 points. The RFP further explained, the cost proposals would be scored based on "the lowest bidder receiving the maximum points allowed for the bid price [and a]ll other non-lowest [p]roposers [receiving] a proportional number of points based on their bid price when compared to the lowest bid price." The maximum cost proposal score was 318 points, combined with the maximum narrative proposal score, for an overall maximum possible score of 1039.2 points.

Additionally, the RFP explained that bidders could also be awarded preference points if they fell within any of the following categories: 1) Small Business/Microbusiness Preference, 2) Non-Small Business Subcontractor Preference, 3) Non-profit Veteran Service Agency Small Business Preference, 4) Disabled Veterans Business Enterprise (DVBE) Incentive, and 5) Target Area Contract Preference Act (TACPA).[3] The RFP stated: "To confirm the identity of the highest scored responsive [p]roposer, DHCS will adjust the total point score for applicable claimed preference(s)," and "DHCS will apply preference adjustments to eligible [p]roposers according to State regulations."

---

[3] TACPA (Gov. Code, § 4530 et seq.) encourages job development in distressed and declining areas by providing preferences to California-based companies submitting bids for state contracts that agree to perform a significant portion of the work in such areas. (See Gov. Code, § 4531.)

The RFP noted that DVBE participation was voluntary, but bidders were "highly encouraged" to participate and, as an incentive, would be granted "additional bonus points." Regarding TACPA, the RFP stated that "[t]he TACPA preference will be applied according to Government Code section 4530 et seq." It further stated that "[p]roposers seeking TACPA preference must submit a completed STD. 830 - Target Area Contract Preference Act Request (Attachment 16) with their Proposal" (hereafter STD. 830 form).

As noted, the STD. 830 form was included as Attachment 16. The RFP contained instructions specific to the STD. 830 form, including that bidders were to "[c]omplete and sign this attachment as instructed in [the] RFP . . . *and the instructions included in the attachment.*" (Italics added.) The form itself, stated, "[t]he bidder must explain, by activity, their firm's projected contract labor hours by completing and signing the *Bidder's Summary* form (included with this solicitation)." The bidder's summary form was not included as part of Attachment 16 or anywhere else in the RFP package.

Finally, the RFP specifically advised that it was "critical that prospective bidders carefully read, study, analyze and understand all sections and provisions of the RFP" and instructed bidders to "[i]mmediately notify DHCS if clarification is needed regarding the services sought or questions arise about the RFP and/or its accompanying materials, instructions, or requirements." Further still, the RFP advised that if bidders submitted a proposal without reporting a known or suspected problem with the RFP or seeking clarification or corrections to the RFP or its accompanying materials, they did so "at their own risk." It then provided detailed instructions regarding how to submit an inquiry. In all, the Department provided written answers to 394 questions submitted to it during the RFP process.

6

The Department received five proposals for the Medi-Cal Rx contract, including proposals submitted by MedImpact and Magellan. Of the five proposals, Magellan and MedImpact received the two highest total scores. Both MedImpact and Magellan indicated an intent to place their call centers in TACPA distressed areas and MedImpact submitted a STD. 830 form.[4] However, neither submitted the required bidder's summary form, and the Department did not award either of them any TACPA preference points. Magellan requested and received DVBE preference points, but MedImpact did not.

MedImpact received a narrative score of 468.65 points, a cost score of 265.84 points, and no preference points, for a total score of 734.49 points. Magellan received a narrative score of 481.1 points, a cost score of 228.32 points, and 51.96 DVBE preference points, for a total score of 761.38 points. Although MedImpact had the lowest bid in terms of cost, Magellan's total score was 26.89 points higher than MedImpact's total score. On November 7, 2019, the Department issued a notice of intent to award the contract to Magellan.

II.

*Petition for Writ of Mandamus*

After the Department announced its intent to award the contract to Magellan, MedImpact filed an administrative appeal. The hearing officer determined the contract was properly awarded to Magellan and denied the appeal. Pursuant to Code of Civil Procedure section 1085, MedImpact then petitioned the superior court for a writ of mandamus to vacate the award to

---

[4] The record is not clear as to whether Magellan submitted an STD. 830 form.

7

Magellan and reopen the bidding on the contract.[5] As in the administrative appeal, MedImpact disputed the Department's evaluation and scoring process and asserted the Department abused its discretion by failing to award TACPA preference points to MedImpact, contrary to the terms of the RFP, and acted arbitrarily and capriciously in scoring the responses to the narrative proposals.

The trial court determined the underlying statute governing the RFP, section 10344, subdivision (c)(3), contemplates discretion on behalf of a public entity to look at factors beyond cost in awarding the public contract and, therefore, it applied the " 'most deferential level of judicial scrutiny' " in reviewing the Department's decision. In doing so, the court found the Department "rationally construed the requirements of the RFP to find MedImpact's submission lacking" to merit any TACPA preference points. The court reviewed the questions and responses to the narrative proposals at issue and concluded that the Department "adequately considered all relevant factors and demonstrated a rational connection between those factors and the points awarded." Affording the Department the most deferential level of judicial scrutiny, the court found substantial evidence supported the scores awarded to MedImpact on the disputed questions.

Accordingly, the court entered judgment denying the petition on October 29, 2020. MedImpact timely appealed.

---

[5] MedImpact also moved for a preliminary injunction to stop the implementation of the Medi-Cal Rx contract. The trial court denied the motion and MedImpact did not appeal that ruling.

DISCUSSION

I.

*Judicial Scrutiny of Public Contracts*

We review de novo the denial of a petition for writ of mandamus, performing the same function as the trial court. (*Schram Construction, Inc. v. Regents of the University of California* (2010) 187 Cal.App.4th 1040, 1051 (*Schram*); *McGill v. Regents of the University of California* (1996) 44 Cal.App.4th 1776, 1786 (*McGill*).) "Mandamus will lie to compel a public official to perform an official act required by law" or "to correct an abuse of discretion by an official acting in an administrative capacity," but it "will not lie *to control an exercise of discretion*, i.e., to compel an official to exercise discretion in a particular manner." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442, citing Code Civ. Proc., § 1085, italics added.)

The level of scrutiny we apply to the Department's decision to award the Medi-Cal Rx contract to Magellan is critical in this case. MedImpact asserts the awarding of public contracts is universally subject to " 'close judicial scrutiny' " and that the trial court erred by affording the Department the " 'most deferential level of judicial scrutiny.' " The Department and Magellan (collectively, Respondents) contend the more deferential standard of review was appropriate because the statutory framework governing the award of the Medi-Cal Rx contract allowed the Department to consider factors other than cost and, therefore, the award was quasi-legislative in nature. Since we review the petition de novo, we are not concerned with the level of scrutiny the trial court applied. Instead, we consider the parties' arguments in the context of determining the level of scrutiny we must apply.

On appeal from a petition for writ of mandamus, "[o]ur review is limited to a determination of 'whether the [public entity's] actions were

9

arbitrary, capricious, entirely lacking in evidentiary support, or inconsistent with proper procedure.' " (*Schram, supra,* 187 Cal.App.4th at p. 1051; accord *Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1303 (*Mike Moore's*); *Ghilotti Construction Co. v. City of Richmond* (1996) 45 Cal.App.4th 897, 903; *McGill, supra,* 44 Cal.App.4th at p. 1786; *Konica Business Machines USA, Inc. v. Regents of the University of California* (1988) 206 Cal.App.3d 449, 453–454 (*Konica*).) We exercise our independent judgment when determining whether the entity's actions were contrary to the procedures provided by law (*Schram,* at p. 1052), but, in doing so, we must consider the amount of leeway the legislature has granted the entity in the first instance.

"The amount of leeway a public entity has in awarding a contract is governed by the statutory or municipal law framework applying to that contract." (*Great West Contractors, Inc. v. Irvine Unified School Dist.* (2010) 187 Cal.App.4th 1425, 1447 (*Great West*).) "A public entity's 'award of a contract, and all of the acts leading up to the award, are legislative in character.' " (*Mike Moore's*, *supra,* 45 Cal.App.4th at p. 1303.) Thus, the " 'letting of contracts by a governmental entity necessarily requires an exercise of discretion guided by considerations of the public welfare.' " (*Ibid*.) In some cases, though, the statutory framework governing the award requires the entity to award the contract to the " 'lowest responsible bidder' " capable of meeting the requirements of the contract. (See *Konica, supra,* 206 Cal.App.3d at pp. 453–454.) In such cases, the award is subject to "close judicial scrutiny and contracts awarded without strict compliance with bidding requirements will be set aside." (*Id*. at p. 456.)

As the court in *Great West* explained, "the difference in governing legal frameworks is itself the ultimate product of a legislative determination of a

10

tradeoff between competing sets of values." (*Great West*, *supra*, 187 Cal.App.4th at p. 1448.) On one hand, "the public interest in guarding against Tammany-style favoritism and corruption" is best served by statutes that require a public entity "to award a contract to the lowest responsible bidder even if it means bypassing a 'superior' bidder." (*Id.* at p. 1449.) "On the other hand, . . . legislative schemes that allow for discretion in public contracting often emphasize just that—discretion." (*Ibid.*) "Thus, where a statute requires a public entity to award a contract to the lowest responsible bidder, the courts have been vigilant in not excusing attempts by public entities to circumvent that requirement." (*Id.* at p. 1448.) "By contrast, where a statute or city charter specifically contemplated discretion on the part of the public entity to look at factors in addition to the monetary benefit of the bid, awards to other than the best monetary bidders have been upheld." (*Ibid.*)

MedImpact relies on *Konica* and *Eel River Disposal and Resource Recovery, Inc. v. County of Humboldt* (2013) 221 Cal.App.4th 209 (*Eel River*) to assert the Department's award of the Medi-Cal Rx contract is subject to strict judicial scrutiny. However, those cases fall into the first category of contracts awarded pursuant to statutes that require a more rigid cost-based competitive bidding process. (See *Konica, supra,* 206 Cal.App.3d at pp. 453–454; *Eel River*, at pp. 235–236.)

In *Konica*, the statute at issue required the Regents of the University of California to award the contract " 'to the lowest responsible bidder *meeting specifications*, or else reject all bids.' " (*Konica, supra,* 206 Cal.App.3d at pp. 453–454; § 10507.7.) The court framed the issue on appeal as "whether there is substantial evidence to support a finding that [the winning] bid met the specifications within the meaning of [the relevant statute]." (*Konica*, at

11

p. 454.)  In that context, the court noted, "[t]he purpose of requiring governmental entities to open the contracts process to public bidding is to *eliminate favoritism, fraud and corruption; avoid misuse of public funds; and stimulate advantageous market place competition*.  [Citations.]  Because of the potential for abuse arising from deviations from strict adherence to standards which promote these public benefits, the letting of public contracts universally receives close judicial scrutiny and *contracts awarded without strict compliance with bidding requirements* will be set aside."  (*Id.* at p. 456, italics added.)  It was largely undisputed in *Konica* that the winning bid did not strictly adhere to the specifications set forth in the RFP and, thus, the court set aside the award.  (*Id.* at p. 457.)

In *Eel River*, the governing statute allowed the County of Humboldt to proceed " 'either with or without competitive bidding' " and the county awarded the contract at issue pursuant to a competitive bidding process.  (*Eel River, supra,* 221 Cal.App.4th at p. 220.)  The court first noted that appellate review of a petition for writ of mandamus challenging a public entity's decision to award a contract is " 'limited to a determination of "whether the [entity's] actions were arbitrary, capricious, entirely lacking in evidentiary support, or inconsistent with proper procedure." ' "  (*Id.* at p. 224.)  It then quoted the following language from *Konica*:  " 'Because of the potential for abuse arising from deviations from strict adherence to [competitive bidding] standards . . . the letting of public contracts universally receives close judicial scrutiny.' "  (*Id.* at p. 225, quoting *Konica, supra,* 206 Cal.App.3d at p. 456.)  The court construed the phrase "competitive bidding" as similar to other statutes applying a "lowest responsible bidder" requirement and found the manner in which the contract was awarded deviated from "strict adherence" with the applicable bidding requirements, giving one bidder "an enormously

12

unfair advantage." (*Eel River,* at pp. 235–236.)  In reaching that conclusion, the court focused on the policy goals underlying " 'competitive bidding,' " including maintaining integrity in government and preventing corruption and extravagance.  (*Id.* at p. 239.)

By contrast, as explained in *Great West*, courts have afforded public entities greater discretion in cases addressing the second type of governing statutes—those that permit the public entity to consider more subjective factors beyond cost.

For example, in *Mike Moore's*, this court considered the award of a contract pursuant to a municipal code that allowed the City to award such contracts to " 'the proposal best meeting City requirements.' " (*Mike Moore's, supra,* 45 Cal.App.4th at pp. 1306–1307.)  In that context, the court explained the award was legislative in character and " 'necessarily requires an exercise of discretion guided by considerations of the public welfare.' " (*Id.* at p. 1303.)  As the court further explained, in such situations, "the courts 'will tend to defer to the presumed expertise of the agency acting within its scope of authority.' " (*Id.* at p. 1306.)  "On appeal, the inquiry is whether the legislative body adequately considered all relevant factors and demonstrated a rational connection between those factors, the choice made, and the purposes of the statute or regulations under which it was acting." (*Id.* at p. 1307.)

Similarly, in *Weinstein v. County of Los Angeles* (2015) 237 Cal.App.4th 944 (*Weinstein*), the court determined the underlying statute *exempted* contracts for personal services from competitive bidding and instead afforded the County of Los Angeles deference in choosing a contractor with the necessary technical skill.  (*Id.* at pp. 966–967.)  Accordingly, the court also applied a "more deferential" level of judicial scrutiny.  (*Ibid.*; see also *Blue*

13

*Cross of California v. State Dept. of Health Care Services* (2007) 153 Cal.App.4th 322, 330 (*Blue Cross*) ["we apply the rule that public agencies are entitled to significant deference when making interpretations that are within their particular expertise"].)

Finally, the court in *Schram* addressed a statutory scheme that permitted the Regents of the University of California to award the contract to the "bidder offering the best *combination* of price and qualifications," so long as it made the award pursuant to published " 'procedures and required criteria that ensure that all selections are conducted in a fair and impartial manner.' " (*Schram, supra,* 187 Cal.App.4th at p. 1053, italics added.) As in *Eel River*, the court first described the limited scope of appellate review of a petition for writ of mandamus, and then quoted the same language from *Konica*: " 'Because of the potential for abuse arising from deviations from strict adherence to [competitive bidding] standards, . . . the letting of public contracts universally receives close judicial scrutiny.' " (*Id.* at pp. 1051–1052.) The court explained that, under the governing statutes, the University was required to independently determine a "qualifications score" for each bidder based on published criteria, and then divide each bidder's previously sealed cost bid by their qualifications score to determine the overall " 'best value contractor.' " (*Id.* at p. 1053.) The court compared that process to other competitive bidding statutes, which " 'guard against favoritism, improvidence, extravagance, fraud and corruption,' " and noted that courts strictly construe such provisions. (*Id.* at pp. 1053–1054.)

In *Schram*, the University had requested bids for a number of related projects and had also requested "alternative" bids for various enumerated combinations of those same projects. (*Schram*, *supra*, 187 Cal.App.4th at p. 1046.) Although it did not say so in the RFP, the University wanted "to

14

retain the fewest number of subcontractors possible," and selected bids at least in part based on that preference. (*Id.* at p. 1050.) The court concluded, by doing so, the University violated the governing statute because it "failed to 'adopt and publish procedures and required criteria that ensure that all selections are conducted in a fair and impartial manner.' " (*Id.* at pp. 1054–1055.) Notably, in reaching that conclusion, the court did not address whether the University could have placed a higher value on a lower number of contractors—had the University included that factor in the RFP— and did not place any limits on the University's discretion in applying the *stated* criteria to determine each bidder's "qualifications score." (*Ibid.*)

Our review of the cases demonstrate that close judicial scrutiny is primarily applicable where the Legislature has emphasized cost savings through a competitive bidding process. In such cases, the courts must require strict adherence with the *competitive bidding process* and any associated *bidding requirements.* Similarly, where the governing statute requires the entity to publish selection criteria, the entity must strictly adhere to any such published criteria. But where the governing statute permits a public entity to consider factors beyond cost, courts may afford the entity greater deference in evaluating those other, more subjective factors.

Here, the statute governing the RFP for the Medi-Cal Rx contract, similar to the one at issue in *Schram*, emphasized cost but also permitted the Department to consider other factors. Section 10344 provides that contracts for services rendered to the state "may be awarded under a procedure that makes use of a request for proposal . . . in accordance with the provisions of [either] subdivision (b) *or* (c)." (§§ 10344, subd. (a), italics added, 10335.) When an agency proceeds under subdivision (b), it receives sealed "bid price and cost information" for all proposals meeting the basic standards specified

15

by the RFP, and the statute specifies the contract must "be awarded to *the lowest responsible bidder* meeting the standards." (§ 10344, subd. (b), italics added.) But when an agency proceeds under subdivision (c), it may consider other non-cost related factors. The RFP must include "a description of the methods that will be used in evaluating and scoring the proposals" and the method described must "ensure that substantial weight in relationship to all other criteria utilized shall be given to the contract price proposed by the bidder." (§ 10344, subd. (c).) An "agency evaluation committee" must "score the proposals using the method specified in the [RFP]" and "[t]he contract *shall be awarded to the bidder whose proposal is given the highest score* by the evaluation committee." (*Ibid.*, italics added.)

The parties agree the Department issued the RFP for the Medi-Cal Rx contract pursuant to section 10344, subdivision (c). Thus, while the statute required the Department to give "substantial weight" to the contract price— suggesting the Legislature was somewhat concerned with cost savings—it also permitted the Department to consider additional factors, so long as they specified, and complied with, the scoring method set forth in the RFP. (See § 10344, subd. (c).) Accordingly, we will require strict adherence to the bidding requirements and the scoring process as set forth in the governing statute and the RFP, but afford the Department greater deference in its evaluation of the additional, more subjective, factors. (See *Schram, supra,* 187 Cal.App.4th at pp. 1054–1055; *Mike Moore's, supra,* 45 Cal.App.4th at p. 1306; *Weinstein, supra,* 237 Cal.App.4th at pp. 966–967; *Blue Cross, supra,* 153 Cal.App.4th at p. 330.)

16

II.

*TACPA Preference Points*

MedImpact asserts the Department violated the governing statutes and acted in an arbitrary and capricious manner when it failed to award MedImpact with TACPA preference points. Respondents counter that MedImpact did not submit all of the required forms and therefore was not entitled to TACPA preference points under the RFP or the governing statutes. As we explain, we conclude the Department's decision not to award MedImpact TACPA preference points was not arbitrary, capricious, lacking in evidentiary support, or inconsistent with the governing laws or procedures. (See *Schram, supra,* 187 Cal.App.4th at p. 1051.)

A. *Relevant TACPA Statutes and RFP Instructions*

The Legislature enacted TACPA "to encourage and facilitate job maintenance and job development in distressed and declining areas of cities and towns in the state . . . by providing appropriate preferences to California[-]based companies submitting bids or proposals for state contracts to be performed at worksites in distressed areas by persons with a high risk of unemployment."[6] (Gov. Code, § 4531.) The statute states, "for contracts for services in excess of one hundred thousand dollars ($100,000) . . . the state shall award a 5-percent preference on the price submitted by California-

---

[6] The statute defines the term " 'California-based company' " to include "either of the following: [¶] (1) A business or corporation whose principal office is located in California, and the owners, or officers if the entity is a corporation, are domiciled in California. [¶] (2) A business or corporation that has a major office or manufacturing facility located in California and that has been licensed by the state on a continuous basis to conduct business within the state and has continuously employed California residents for work within the state during the three years prior to submitting a bid or proposal for a state contract." (Gov. Code, § 4532.)

based companies that demonstrate and certify under penalty of perjury that not less than 90 percent of the total labor hours required to perform the contract shall be accomplished at an identified worksite or worksites." (Gov. Code, § 4534, subd. (a).) In addition, the state shall award an additional preference of up to 4 percent for bidders who agree to hire a certain percentage of "persons with [a] high risk of unemployment . . . during the period of contract performance." (Gov. Code, §§ 4533.1, 4534, subd. (b).)

As specified in the RFP at issue, California law also provides for other preferences in the awarding of state contracts, including the preference for small business, and those preferences must be balanced against one another. (See Gov. Code, § 14838, subd. (b).) Government Code section 4535.2 provides, in relevant part: "The maximum preference and incentive a bidder may be awarded pursuant to this chapter [TACPA] and any other provision of law shall be 15 percent. However, in no case shall the maximum preference and incentive cost under this chapter exceed fifty thousand dollars ($50,000) for any bid, nor shall the combined cost of preferences and incentives granted pursuant to this chapter and any other provision of law exceed one hundred thousand dollars($100,000). In those cases where the 15-percent cumulated preference and incentive cost would exceed the one hundred thousand dollar ($100,000) maximum preference and incentive cost limit, the one hundred thousand dollar ($100,000) maximum preference and incentive cost limit shall apply." (Gov. Code, § 4535.2, subd. (a).) In addition, it ensures small business bidders continue to have preference over non-small business, regardless of TACPA preference incentives. (Gov. Code, § 4535.2, subd. (b).)

Here, the RFP addressed TACPA in subsection 5 of "Preference and Incentive Programs" and stated: "The TACPA preference will be applied

18

according to Government Code section 4530 et seq." It then instructed bidders as follows:

> "d. [Bidders] seeking TACPA preference must submit a completed STD. 830 - Target Area Contract Preference Act Request **(Attachment 16)** with their [p]roposal. The applicable preference request form must include the following:
>
> 1) All appropriate certifications.
> 2) The proposing firm's name and the name of all suppliers and Subcontractors that will work with the [bidder] to fulfill the terms of the Contract along with the addresses of each of the worksite(s) and estimated labor hours.
> 3) County census tract number and block group number.
> 4) [Bidder]'s original signature.
> 5) A checkbox marked to identify the additional one percent (1%) to four percent (4%) preference sought for hiring persons with a high risk of unemployment."

(Emphasis in the original.)

As noted, the STD. 830 form was included as Attachment 16. The general instructions regarding the attachments to the RFP stated, "[w]hen completing the attachments, follow the instructions in this section *and all instructions appearing on the attachments themselves*." (Italics added.) The instructions specific to attachment 16 further stated, "[c]omplete and sign this attachment as instructed in [the] RFP . . . *and the instructions included in the attachment*." (Italics added.) The form itself, stated, "[t]he bidder must explain, by activity, their firm's projected contract labor hours by completing and signing the *Bidder's Summary* form (included with this solicitation)."

B. *The Department's Decision to Not Award MedImpact with TACPA Preference Points Was Consistent with TACPA and the RFP*

The Department did not award MedImpact TACPA points because MedImpact did not submit a bidder's summary form as directed by the

19

instructions in Attachment 16 to the RFP. We conclude the Department's decision was consistent with the TACPA statutes and the requirements and procedures set forth in the RFP.

The TACPA statutes require the state to award "a 5-percent preference on the price submitted by California-based companies that *demonstrate* and certify under penalty of perjury that not less than 90 percent of the total labor hours required to perform the contract shall be accomplished at an identified worksite or worksites." (Gov. Code, § 4534, subd. (a), italics added.) Here, MedImpact made the requisite certification by signing and submitting the STD. 830 form. But, by neglecting to submit the associated bidder's summary form, it failed to demonstrate that "not less than 90 percent of the total labor hours required to perform the contract [would] be accomplished at an identified [TACPA] worksite," as required by the statute. (See *ibid.*)

The STD. 830 form indicated the number of projected labor hours that would be performed at the identified TACPA worksite, but it did not provide a full accounting of the total number of hours necessary to complete the project. The bidder's summary form that MedImpact omitted would have required MedImpact to set forth the projected contract labor hours for each contract activity and, thus, would have provided the *total* number of contract hours. Without that information, the Department had no way to determine what percentage of the overall project hours were represented by the number of hours listed on MedImpact's STD. 830 form. Thus, MedImpact did not demonstrate compliance with the TACPA statutes and was not entitled to an award of TACPA preference points.

MedImpact asserts the Department improperly shifted the blame by faulting it for not submitting a form that the Department did not include in the RFP. We acknowledge this situation likely could have been avoided in

20

the first instance had the Department simply included the bidder's summary form along with the STD. 830 form in the attachments to the RFP. However, there was no statutory requirement that the Department include the document as an attachment to the RFP, nor was there any statement in the RFP itself indicating the attachments included *all* necessary forms. Instead, the RFP informed bidders at least twice—once in the directions for the STD. 830 form itself—that they needed to comply with the instructions appearing *in the attachments themselves.* Further, the RFP directed bidders "wishing to learn more about TACPA requirements" to contact the Department of General Services and MedImpact does not dispute that the bidder's summary form was readily available on the Department of General Services website.[7]

Further still, the RFP repeatedly alerted bidders that it was their responsibility to ensure their submission was complete and to seek clarification if necessary. Indeed, the RFP contained an entire section, towards the front of the document, which advised bidders to "[i]mmediately notify DHCS if clarification is needed . . . or questions arise about the RFP and/or its accompanying materials, instructions, or requirements." It further stated that bidders who "fail to report a known or suspected problem with the RFP and/or its accompanying materials or fail to seek clarification and/or correction of the RFP and/or its accompanying materials shall submit a [p]roposal at their own risk." It then provided detailed information about how and when to submit questions or seek clarification. Indeed, the Department provided written answers to 394 questions submitted to it during the RFP process.

---

[7] (See https://www.documents.dgs.ca.gov/dgs/fmc/gs/pd/gspd0526.pdf [as of November 19, 2021], archived at <https://perma.cc/86QR-AEGX>.)

21

These same points were reiterated in the general submission instructions, which stated: "Before submitting a [p]roposal, seek timely written clarification of any requirements or instructions that are believed to be vague, unclear or that are not fully understood. *The [bidder] assumes the risk that its [p]roposal may be rejected for failure to follow a rule or requirement which DHCS interprets differently than the [bidder] did in preparing its [p]roposal*." (Italics added.) In addition, the very next paragraph informed bidders, "[e]ach Proposal must be complete with required content, attachments and documentation."

Notwithstanding those repeated instructions, MedImpact argues the Department violated its obligation to clearly notify bidders of the scoring criteria by imposing an " 'after-the-fact requirement' " not set forth in the RFP. (See *DeSilva Gates Construction, LP v. Dept. of Transportation* (2015) 242 Cal.App.4th 1409, 1421 [public entity abused its discretion by rejecting bid as nonresponsive based on "after-the-fact requirement"].) Therefore, MedImpact asserts, we should set aside the award, in accordance with *Konica, Eel River,* and *Schram.*

As we have just explained, the RFP *did* adequately notify bidders of the rules, including the rule that they follow all instructions on the attachments. Thus, this is not a case like *Konica* where the public entity accepted bids that clearly did not meet the required specifications. (See *Konica, supra,* 206 Cal.App.3d at p. 457.) It is also not comparable to *Eel River* or *Schram* where the public entities relied on a previously undisclosed criteria—whether a bidder was locally owned and operated and an undisclosed preference to retain the fewest number of subcontractors possible—in selecting the winning bid. (See *Eel River, supra,* 221 Cal.App.4th at p. 237; *Schram, supra,* 187 Cal.App.4th at p. 1050.) Instead, here, all bidders were aware that TACPA

preference points were available if they demonstrated and certified compliance with the statute. MedImpact simply failed to do so.[8]

Notably, Magellan also did not submit a bidder's summary form, and the Department also did not award TACPA preference points to Magellan. MedImpact refers to Magellan as an out-of-state company and, in a footnote, baldly asserts, "[a]s a non-California company, Magellan would not have been eligible for TACPA points." However, the statute is not so narrow and defines " 'California-based company' " to include companies that, among other requirements, have a "major office or manufacturing facility" in California. (Gov. Code, § 4532.) Like MedImpact, Magellan proposed a major call center in a TACPA qualified distressed area in California. MedImpact provides no evidentiary support for its suggestion that, notwithstanding that proposed facility, Magellan could not have qualified as a "California-based company" under TACPA.

In sum, although we require strict adherence to the governing statutes and the requirements and procedures set forth in the RFP, we conclude the Department did not violate statutory law or deviate from the requirements of the RFP. The Department's decision to not award TACPA preference points to MedImpact was not arbitrary, capricious, lacking in evidentiary support,

---

8    MedImpact separately asserts the trial court erred by concluding the STD. 830 form it submitted was facially deficient because it listed only "810.000" labor hours. The form itself is not entirely clear, due in large part to the relatively small size of the box in which the number appears, but we find it highly improbable that MedImpact intended to list "810.000" hours, and not 810,000 hours. Regardless, though, without the bidder's summary form, even the 810,000 hours was insufficient to demonstrate the 90 percent requirement under the governing statutes.

or inconsistent with the governing laws or procedures.[9]  (See *Schram, supra,* 187 Cal.App.4th at p. 1051.)

III.

*Scoring of Narrative Proposals*

MedImpact asserts the Department did not require the evaluators to follow the scoring guidelines set forth in the RFP and, therefore, acted arbitrarily and capriciously in scoring the narrative proposals.  However, the majority of MedImpact's assertions simply critique the scores provided by the evaluators.  The scoring of narrative responses requires subject matter expertise and is necessarily an exercise of discretion.  Accordingly, this is an area in which we will afford the Department and its evaluators significant deference.  (See *Mike Moore's, supra,* 45 Cal.App.4th at p. 1303.)  While we require strict adherence to the scoring *process* set forth in the statutes and the RFP, we will not reweigh the scores themselves or substitute our own judgment for that of the Department.  (*Ibid.*; *Schram, supra,* 187 Cal.App.4th at pp. 1054–1055; *Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 995 [" 'In determining whether an agency has abused its discretion, the

---

[9]     Respondents assert that even if we were to conclude the Department should have awarded MedImpact with TACPA points, which we do not, the amount of TACPA points available would be minimal based on the limitation set forth in Government Code section 4535.2.  Since we have already concluded the Department's decision not to award MedImpact any TACPA preference points was not arbitrary, capricious, lacking in evidentiary support, or contrary to the procedures provided by law or the RFP, we need not reach this issue.  Further, we hereby deny MedImpact's two requests that we take judicial notice of certain legislative history materials related to Government Code section 4535.2 as those materials have no bearing on the outcome of this appeal.  (See *Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 701, fn. 1.)

court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld.' "].)

As we explain, the Department did not deviate from the scoring process set forth in the RFP and its scoring of the individual narrative responses was neither arbitrary nor capricious.

A.   *The Department Did Not Deviate from the Scoring Process Set Forth in the Governing Statutes or the RFP*

The RFP provided extensive details regarding the scope of work required under the contract, the associated content required in the narrative proposals, and the process by which the Department would score the associated responses.  It specified that the narrative proposals would be submitted to an Evaluation Scoring Committee to "review, evaluate and numerically score . . . each [n]arrative [p]roposal based on the [p]roposal's adequacy and thoroughness and the degree to which it complies with the RFP requirements."  It then provided a rubric to guide the scoring on a scale from 0 (Inadequate) to 4 (Excellent or Outstanding) as well as a non-comprehensive list of factors the evaluators could consider.  Thus, the RFP made clear the evaluators would need to conduct a comprehensive review of the narrative proposals and consider numerous factors in scoring each response.

The Department assigned 38 evaluators to score the narrative proposals in accordance with the procedures set forth in the RFP.  Each evaluator attended orientation and individual training sessions before scoring the proposals.  After the scoring was complete, the Department identified and evaluated a relatively small number of scoring anomalies and conducted an internal audit of the scores.

25

MedImpact does not dispute that qualified evaluators scored each individual response based on the identified scoring rubric and non-comprehensive list of additional factors set forth in the RFP. Indeed, only one of MedImpact's arguments relates directly to the scoring *process*, as opposed to the evaluator's discretion in determining the actual score to award. MedImpact argues the RFP instructed bidders to identify the sections of their proposals that were responsive to each narrative question by submitting a "Proposer Response Guide" and "DHCS admitted that it did not score the responses to the narrative questions based on the sections identified in the proposals."

To support its assertion, MedImpact relies on the declaration of La Vonda Williams, submitted by the Department in support of its opposition to the petition for writ of mandamus.[10] As the declaration explained, "[t]he purpose of the Proposer Response Guide was to enable the evaluator to locate a proposer's response to a specific question within the proposal. Evaluators were not limited to the citations identified in the Proposer Response Guide in their evaluation and scoring of the proposer's response to a specific evaluation question." As Williams further explained, "the evaluators were not instructed to comment on every aspect of the proposal that was considered when scoring a proposer's response to a question." Those statements are consistent with the instructions in the RFP.

The instructions to the RFP stated, "[t]he Proposer Response Guide is a document which identifies where a [p]roposer has provided information that

_____

[10] The trial court sustained evidentiary objections to the declarations submitted by both parties, including the Williams declaration. The parties do not object to MedImpact's reliance on the Williams declaration on appeal and we therefore consider it in the context of MedImpact's related assertions.

fully explains details or otherwise provides information that will enable evaluators to make an informed evaluation of the proposal for a specific evaluation question." MedImpact does not identify, and we are not aware of, any language in the RFP *limiting* evaluators to consideration of *only* those sections identified in the Proposer Response Guide, or requiring evaluators to list every section they considered. Further, nothing in the Williams declaration suggests the evaluators did not consider the sections that *were* identified in the Proposer Response Guide. Instead, the declaration simply stated the evaluators were not *limited* to the identified sections. This is not evidence, as MedImpact asserts, of a deviation from the stated scoring process.

B.  *The Department's Scoring of the Narrative Proposals Was Not Arbitrary or Capricious*

MedImpact's remaining arguments relate to the individual scores awarded by the evaluators. MedImpact characterizes the individual scores as inconsistent with the scoring process by asserting the evaluators failed to fully consider MedImpact's answers while viewing Magellan's answers expansively and/or reduced MedImpact's scores based on new unannounced requirements. However, the arguments MedImpact presents with respect to the individual questions do not indicate a lack of adherence to the stated scoring procedure and, instead, ask us to reweigh the individual scores. We address MedImpact's arguments with respect to each individual question but, in doing so, we decline to substitute our own judgment for that of the Department. (See *Mike Moore's, supra,* 45 Cal.App.4th at p. 1303.)

1.  *Question 123*

Question 123 asked: "To what extent does the [p]roposer describe, clearly and in detail, their overall understanding of the Medi-Cal Rx requirements for the Optional Contractual Services proposal for the

27

Pharmacy Lock-In Program?" MedImpact received a score of 2 from one evaluator and a score of 3 from the other. Magellan received a score of 3 from each of the two evaluators. The evaluator awarding the 2 to MedImpact noted MedImpact's proposal relied on National Provider Identifiers (NPIs)[11] and stated, "[t]he [p]roposal does not provide evidence-based support for their proposed solution or clarify what would happen if the pharmacy changed owners and hence NPIs changed and/or if it had multiple NPIs."

MedImpact argues it did not understand that " 'relying on NPIs' " and not clarifying what would happen if pharmacies changed ownership was relevant to its Pharmacy Lock-In Program. MedImpact does not explain how its own understanding, or misunderstanding, of what was relevant to the Pharmacy Lock-In Program suggests a deviation from the scoring process set forth in the RFP. To the contrary, the question required the evaluator to assess the bidder's "overall understanding" of the requirements for the Pharmacy Lock-In Program and that appears to be what the evaluators did.

MedImpact also asserts Magellan was not criticized for similar omissions, but MedImpact merely quotes the evaluator's comments regarding its own response, and provides no evidence suggesting Magellan's proposed solution was similar, or similarly deficient. We defer to the expertise of the Department in evaluating the two proposals.

2.  *Question 41*

Question 41 asked: "To what extent does the [p]roposer describe, clearly and in detail, their approach, capability and capacity, including but not limited to methods, tools, and frequency, for evaluating their Medi-Cal Rx

---

11   An NPI is a unique, randomized identification number used by covered health care providers for administrative and financial transactions adopted under HIPAA.

Customer Service delivery to react to inquiry patterns with the goal of reducing and/or eliminating those customer service inquiries to the extent feasible?  For example, such patterns may include repeated inquiries on a topic by multiple callers within a given timeframe, repeated inquires on a topic by a single caller over a given timeframe, etc."  Again, MedImpact received a score of 2 from one evaluator and a score of 3 from the other while Magellan received a score of 3 from each of the two evaluators.

As with Question 123, MedImpact contends the evaluator deviated from the requirements of the RFP by criticizing MedImpact for not including features that *it* did not understand to be relevant.  Again, the Department has the requisite expertise to evaluate what is and is not relevant to the question it posed, and we will not substitute our own judgment for that of the Department.  (See *Mike Moore's, supra,* 45 Cal.App.4th at p. 1303.)

MedImpact also asserts the evaluator credited Magellan for features that were present in its own proposal.  However, there was no requirement that the evaluator list every relevant feature in each score explanation.  Instead, the evaluator's comments captured a key difference, noting MedImpact would "need to enhance the capability of their current system in order to meet the RFP expectations," while Magellan's system "is more than adequate and fully meets" or exceeds the stated requirement.  That is a sufficient basis for the difference in scores.

3.    *Question 33*

Question 33 asked:  "To what extent does the [p]roposer describe, clearly and in detail, their overall understanding of the Medi-Cal Rx requirements for Customer Service Center?"  MedImpact received a score of 2 from each of the two evaluators and Magellan received a score of 3 from one evaluator and a score of 2 from the other.

29

MedImpact criticizes the evaluator for not citing to the specific subsection of Magellan's narrative proposal that Magellan identified as responsive to the question in its Proposer Reference Guide. As we already discussed, the evaluators were not limited to the cited sections and, regardless, the evaluator did cite several subsequent subsections in the same larger section as the subsection identified by Magellan.

In addition, MedImpact criticizes the evaluator for noting Magellan's "Customer Service Center will use proprietary and third-party programs for processing communications, pulling beneficiary data and evaluating employee performance," while failing to consider the same features of MedImpact's Customer Service Center. To the contrary, the evaluator noted MedImpact would need to modify its existing software programs, a factor that it likely considered in awarding a slightly lower score. Again, MedImpact does not dispute the veracity of the evaluator's comment and we will not substitute our judgment for that of the Department.

4. *Question 34*

Question 34 asked: "To what extent does the [p]roposer describe, clearly and in detail, their comprehensive and innovative approaches to meet or exceed the Medi-Cal Rx requirements for Customer Service Center using their people, processes and technical capabilities?" MedImpact received a score of 2 from each of the two evaluators and Magellan received a score of 2 from one evaluator and 3 from the other.

MedImpact's sole criticism is that the evaluators credited Magellan for features that were also included in its proposal. Again, though, the evaluator noted that MedImpact would need to modify its systems, while Magellan's already met the requirements. MedImpact does not dispute that it would

30

need to modify its systems and that difference is sufficient to explain the difference in scores.

5.    *Question 66*

Question 66 asked: "To what extent does the [p]roposer describe, clearly and in detail, their overall understanding of the Medi-Cal Rx requirements for the Quality Management Program to measure, review, and report their performance of contract responsibilities?" MedImpact received a score of 2 from each of the two evaluators while Magellan received a score of 3 from one evaluator and a score of 2 from the other.

Again, MedImpact criticizes the evaluators solely for crediting Magellan for features that were also included in its own proposal. In comparing the two responses, the evaluator did mention many of the same features in both evaluations, including, for example, monthly reporting. However, the evaluator also noted Magellan had a sub-contractor to perform audits while MedImpact referred to internal auditing. Again, MedImpact does not dispute the veracity of the evaluator's comments and we will not substitute our own judgment for that of the evaluators.

6.    *Question 122*

Question 122 asked: "To what extent does the [p]roposer describe, clearly and in detail, their comprehensive and innovative approaches to meet or exceed the Medi-Cal Rx requirements for the Optional Contractual Services for Step Therapy using their people, processes and technical capabilities?" MedImpact received a score of 2 from one evaluator and 3 from the other and Magellan received a score of 3 from the first evaluator and 2 from the second. Thus, they each received a total score of 5.

MedImpact again asserts the "evaluators" credited Magellan for features it also had, but both received the same overall score, although each

of the two evaluators rated each of the two responses differently.  This is a prime example of how reasonable evaluators may differ, particularly when evaluating subjective factors.  Regardless, we defer to their expertise.

7.    *Remaining Questions*

Finally, MedImpact asserts the Department did not "fully consider[ ]" its answers to a number of additional questions.  In each instance, MedImpact criticizes the evaluator for a single comment, without discussing the evaluator's complete explanation of the score or comparing remarks or the score to the remarks or the score Magellan received.  Each of these assertions asks us to substitute our own judgment for that of DHCS.  We decline to do so.

In sum, we conclude the Department's scoring of responses to the narrative proposals was not arbitrary, capricious, lacking in evidentiary support, or contrary to procedures provided by law or the governing RFP.  (See *Schram, supra,* 187 Cal.App.4th at p. 1051.)

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


DO, J.


WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.